# IN THE SUPREME COURT OF TENNESSEE
## AT KNOXVILLE
May 11, 2011 Session

## STATE OF TENNESSEE v. JOSHUA LYNN PARKER

**Appeal by Permission from the Court of Criminal Appeals**
**Circuit Court for Cocke County**
**No. 0177      Ben W. Hooper II, Judge**

---

**No. E2008-02541-SC-R11-CD - Filed: September 23, 2011**

---

We granted this appeal by the State to determine if the defendant's conviction of second degree murder should be affirmed pursuant to State v. Mellons, 557 S.W.2d 497 (Tenn. 1977), despite insufficient evidence to support it. We hold that Mellons does not control the outcome of this case. We also hold that sufficient proof must support every element of the offense of which a defendant is convicted, even where the conviction offense is charged as a lesser-included offense and sufficient proof supports the greater offense. In this case, the trial court erred in charging the jury with second degree murder as a lesser-included offense of first degree felony murder. Because the proof is not sufficient to support it, we must reverse and vacate the conviction of second degree murder. However, because the proof is sufficient to support the offense of reckless homicide, we remand this matter to the trial court for (1) entry of an amended judgment reflecting a conviction of reckless homicide, and (2) sentencing on reckless homicide. The defendant is entitled to no relief on his remaining issues. The judgment of the Court of Criminal Appeals is affirmed in part and reversed in part.

**Tenn. R. App. 11 Appeal by Permission; Judgment of the**
**Court of Criminal Appeals Affirmed in Part, Reversed in Part;**
**Remanded to the Trial Court**

CORNELIA A. CLARK, C.J., delivered the opinion of the Court, in which JANICE M. HOLDER, GARY R. WADE, WILLIAM C. KOCH, JR., and SHARON G. LEE, JJ., joined.

Edward C. Miller, District Public Defender, and Keith E. Haas, Assistant Public Defender, for the appellant, Joshua Lynn Parker.

Robert E. Cooper, Jr., Attorney General & Reporter; Gordon W. Smith, Associate Solicitor General; Matthew Bryant Haskell, Assistant Attorney General; and Al Schmutzer, Jr., District Attorney General Pro Tempore, for the appellee, State of Tennessee.

## OPINION

### Factual and Procedural Background

The victim in this case, Ms. Evelyn Lucy Lackey, was sixty-five years old when she was sexually assaulted in her home on the evening of April 8, 2003. Although she was taken to the hospital and discharged in apparent good health after the attack, she was found deceased in her apartment the next day. An autopsy revealed that the cause of death was a subdural hematoma. Murder and attempted rape charges were eventually brought against the defendant Joshua Lynn Parker ("Defendant"), and he was tried before a jury.[1] The proof at trial established the following.

Ms. Lackey lived in a building consisting of two apartments, one upstairs and one downstairs. Ms. Lackey lived in the downstairs apartment, and Fred Trentham lived in the upstairs apartment. An exterior door from Ms. Lackey's bedroom led to a staircase that went to the upstairs apartment.

On the evening of April 8, 2003, Ms. Lackey answered a knock at her front door and saw a man she recognized as an acquaintance of her son. The man entered the living room of Ms. Lackey's apartment and subsequently sexually assaulted her in her bedroom. When the assailant heard knocking at the front door, he left Ms. Lackey in her bedroom and went to see about the noise. Ms. Lackey, who had been stripped of her pants and underwear, escaped her bedroom through the exterior door and went up the stairs to her neighbor's apartment.

Fred Trentham testified that he was home on the evening of April 8, 2003. After dark, he heard what sounded like a car pull up, so he looked outside because it was unusual for a car to pull up at that time of night. Unsure of what he had heard, he sat back down. Eight to ten minutes later, he heard an "urgent beating" on his door. He opened the door, and Ms. Lackey was standing there wearing only a shirt. Mr. Trentham told her to come in and gave her a sheet to wrap around herself. He stated that Ms. Lackey was "shaking uncontrollably" and that she was so scared she "couldn't even remember her age." As he was tending to her, he heard a car pull off, but he did not get a good look at it.

---

[1] Defendant was charged in a three-count indictment with first degree felony murder, second degree murder, and attempt to commit rape. The State proceeded to trial on only the first and third counts.

Mr. Trentham asked the victim what had happened, and she told him that she had been "attacked." Ms. Lackey told Mr. Trentham that she knew her attacker, and he testified that "it was something about someone her son knew on the can crew."[2] Mr. Trentham called 911, and the police and the ambulance arrived within a few minutes. Mr. Trentham described the victim as appearing older than sixty-five.

On cross-examination, Mr. Trentham acknowledged that the victim could not remember her attacker's name.

Kevin Benton, a deputy sheriff with the Cocke County Sheriff's Department, arrived at 9:13 p.m. He went to Mr. Trentham's apartment and spoke with Ms. Lackey. Deputy Benton described Ms. Lackey as "very distressed, upset." He asked her what had happened and, over the defense's objection, testified as follows:

> She started telling us a story that a gentleman – or that a man had came to her door and knocked. She had opened up the door, looked – or first of all, she had looked out and seen another car sitting – or seen a car sitting there and somebody sitting in it, and whenever she opened the door, this man had pushed his way into the – pushed his way up against her and had her by the throat and took her into the bedroom.

> She said that he pushed her down and started – and jerked her pants and her underwear off of her.

Ms. Lackey described her assailant to Deputy Benton as "a white male, approximately five foot nine, long black hair with a goatee, wearing camouflaged pants, . . . [with] a tear in the right leg and . . . a white Dale Earnhardt shirt." Ms. Lackey also told Deputy Benton that she recognized the man because he "had been on the can crew with her son."

An ambulance from Quality Care Ambulance Service arrived at 9:35 p.m., and Ms. Lindsey Ellison, an emergency medical technician, assisted Ms. Lackey. Ms. Ellison described the victim as "wearing a sweatshirt, wrapped in a sheet from the waist down and very anxious and nervous." Ms. Lackey told Ms. Ellison that she wanted to put some clothes on before going to the hospital, so Ms. Ellison accompanied Ms. Lackey downstairs to her apartment. They walked in through the side door into the victim's bedroom. Ms. Ellison noticed "[p]ants and underwear laying on the floor next to the bed and a ball cap on the bed."

---

[2] At no point during the trial did a witness explain what the "can crew" was or its precise relationship with the jail. The State's brief in the Court of Criminal Appeals explains that "[t]he can crew apparently references a can collection program for inmates of the county jail, and the reference appears not to have been explained to the jury. Rather, the term seems to be commonly known in the trial court."

Ms. Lackey identified the ball cap as her attacker's and handed it to Ms. Ellison. Ms. Ellison, in turn, "handed it over to the officer."

The victim told Ms. Ellison that "a guy came in to get some cigarettes and had talked to her for a while and before he left, he stuck his hand in her private area and attempted to choke her." Ms. Ellison stated that Ms. Lackey had red marks on her throat that were consistent with her description of having been choked.

On cross-examination, Ms. Ellison acknowledged that there was more than one police officer on the scene while she was there. Ms. Ellison also said that Ms. Lackey told her that the attacker was a friend or acquaintance of Ms. Lackey's son.

Deputy Benton also accompanied Ms. Lackey back to her apartment after the ambulance arrived. He testified that "it appeared that a struggle had occurred there. The covers [on the victim's bed] w[ere] tore up, there was – her clothes w[ere] laying [sic] there on the floor just next to the bed. It seemed like a couple of things w[ere] knocked around, had been turned over." He also saw a Jeff Gordon hat laying on the bed, which was subsequently given to him and which he placed in a plastic bag. Ms. Lackey told him that her attacker had been wearing the hat.

After Ms. Lackey was taken to the hospital, Deputies Benton and Eric Rinehart went to the third floor of the courthouse where the jail was located and talked to the jailer about the participants in the can crew. The jailer gave the officers some photographs to review, and the officers selected two that matched the description given by the victim. Neither of these photographs depicted Defendant. The officers went to the hospital and showed the two photographs to Ms. Lackey. According to Deputy Benton, the victim "said that out of the two . . . [the one of Tim Bird] matched more of the description." She did not identify by name the individual in the photograph. Deputy Benton took Ms. Lackey back to her apartment after she was discharged from the hospital. He did not speak with her again.

On cross-examination, Deputy Benton acknowledged that, on April 17, 2003, he wrote a report about his encounter with the victim. This report was admitted into evidence and provides as follows:

On 8 April 03 at approx 11 PM officers responded to a[n] attempted rape at 492 Hwy 160 Newport TN. Upon arrival officers came into contact with Evelyn Lackey, W, F, DOB 8-27-37. Ms. Lackey told officers that she heard someone knock at her door. When she looked out she reco[g]nized a[n] individual who had been on the can crew with her son, Johnny Lackey. Ms. Lackey said she opened the door and the subject came in. The suspect grabbed Ms. Lackey by the throat and forced her into the bedroom. The suspect then

jerked Ms. Lackey's pants and underw[ear] off. Lackey told officers the suspect app[a]rently heard a noise and went to look and Ms. Lackey ran out the side door and ran upstairs to her neighbors. Quality Care [Ambulance Service] was called to the scene. Ms. Lackey and a[n] EMT Ellison entered the home and found a Jeff Gordon hat laying on the bed. Lackey was transported to Baptist Hospital ER by Quality Care. Lackey stayed at the ER for an est[imated] 4 hours. Lackey was transported back to her residence by Dep. Benton who checked the home to make sure it was clear. While at the ER Lackey made a[n] ID on the suspect as Tim Bird. Lackey told officers that a[n] unknown subject stayed in the black vehicle (car) and that it was headed in the direction of Newport.

Melissa Cogdill, a registered nurse at Baptist Cocke County Hospital, testified that Ms. Lackey was admitted to the hospital at 9:53 p.m. on April 8, 2003. Ms. Cogdill and Mary Alice Hall "triaged" the victim. Ms. Lackey reported that a friend of her son had tried to rape her with his hand and had choked her. The victim also stated that her assailant had "put her to the ground and then bent her legs up over her head," and that he had pulled her pants off. Ms. Cogdill noted some redness around the victim's neck. Ms. Lackey also complained about a headache, explaining that "she always gets a headache when she was stressed." Ms. Cogdill reported the victim's complaint to the doctor and subsequently gave her some Tylenol. Ms. Lackey later stated that her headache was better, and she was released at 1:05 a.m. on April 9, 2003.

On cross-examination, Ms. Cogdill acknowledged that she had not observed on the victim "any bumps, bruises, cuts, abrasions to [the] head, scalp, face, ears, neck, shoulders, back, legs, [or] knees." Further, the records reflected no order of an MRI or CAT scan of the victim's head after she complained of a headache. Ms. Cogdill also acknowledged that Ms. Lackey never told her that she had been hit or struck anywhere around her head and that the victim had been coherent.

The parties stipulated that Ms. Lackey was found deceased in her home by Detective Brian Murr at approximately 2:30 p.m. on April 9, 2003.

Dr. Darinka Mileusnic-Polchan performed an autopsy on the victim on April 10, 2003. Dr. Mileusnic-Polchan described the victim as "slender and small," weighing less than one hundred pounds. She acknowledged that Ms. Lackey's condition was consistent with her age of sixty-five. There was no evidence of sexual penetration. On further examination, Dr. Mileusnic-Polchan discovered a subdural hemorrhage "between the hard covering of the brain and the brain itself." Dr. Mileusnic-Polchan opined that this hemorrhage caused Ms. Lackey's death. As to the cause of the hemorrhage, Dr. Mileusnic-Polchan explained:

The cause for subdural hemorrhage particularly in this age population is trauma, blunt trauma to the head. It could be a blow, it could be a fall and could be also any mechanism that is going to her head to perform like a sudden deceleration, meaning she was moving and maybe kind of hitting a hard surface, or any surface for that matter that is going to decelerate the head, meaning the brain is starting to – or continuing to move with the blood vessels, the head stops suddenly and the deceleration injury stretches the bridging veins and causes the tearing of the veins that leads to the subdural bleeding.

Based on her autopsy and the information she received from Dr. David McConnell, the Cocke County medical examiner, regarding his examination of the victim upon her death, Dr. Mileusnic-Polchan opined that Ms. Lackey died on the morning after she was attacked. Dr. Mileusnic-Polchan testified that, based on the characteristics of the clotted blood in the hemorrhage, the trauma which caused the hemorrhage occurred around the time of the attack. She also opined that the hemorrhage would not have occurred after Ms. Lackey's release from the hospital on the morning of the 9th. Questioned further, Dr. Mileusnic-Polchan stated that

elderly people do take a little bit less trauma than younger people just because as we age the brain starts slightly shrinking and the bridging veins are already kind of stretching and elongated; however, it has to be enough severe trauma to cause it. It cannot be just any household fall for that matter.

Dr. Mileusnic-Polchan also testified that "[t]he main symptom from this type of trauma would be a headache" and that a headache "is actually the initial symptom in many cases."

On cross-examination, Dr. Mileusnic-Polchan acknowledged that the injury causing the hemorrhage could have occurred as early as the morning of April 8, 2003. She also acknowledged that the autopsy revealed no external injuries to the top or side of the victim's head, and she did not find a skull fracture.

On redirect, Dr. Mileusnic-Polchan described Ms. Lackey's injury as "a classic deceleration injury," an example of which is "the head being violently either going forward or backward fast and then stopping suddenly, the brain continuing to move, bouncing against the inside of the skull."

Ronald Pruitt testified that he knew Defendant and drove him out to Ms. Lackey's residence so Defendant could borrow some money from someone. While Defendant was inside, Mr. Pruitt waited in the car. When Defendant had not returned after fifteen or twenty minutes, Mr. Pruitt got out of the car and knocked on the door of the building. Defendant answered and told Mr. Pruitt to get back in the car. Mr. Pruitt got back in the car and

continued to wait for Defendant. When Defendant returned to the car, he told Mr. Pruitt to let him drive.

On cross-examination, Mr. Pruitt stated that it was daylight when they arrived at the victim's residence, and still daylight when they left. Mr. Pruitt also acknowledged that he did not remember the exact date in April 2003 that he and Defendant drove to the victim's residence. He testified that he had had "over a six-pack" to drink that night, and that he had suffered a head injury more than twenty years earlier which "slow[ed]" his "thinking."

Johnny Lackey, the victim's son, testified that he knew both Defendant and Tim Bird and had been on the can crew with both of them. He also stated that his mother had met Defendant but had not met Tim Bird.

On cross-examination, Mr. Lackey acknowledged that he had been on the can crew from January 2002 to sometime in May 2003, and that he came into contact with many people during that time. He also acknowledged that his mother often came to see him when he was "loading up" with the crew. His mother had moved to the apartment where she was attacked about nine or ten months before she died, and he walked past her apartment from time to time while serving on the crew.

Robert Caldwell, the chief detective with the Cocke County Sheriff's Department, investigated Ms. Lackey's death, assisted by Agent Derek Newport of the Tennessee Bureau of Investigation ("TBI"). On April 10, 2003, Deputy Benton gave Detective Caldwell the hat recovered from the scene. The hat was in a plastic bag.

Detective Caldwell initially focused his investigation on Tim Bird, but subsequently received an anonymous phone call from a male that caused him to change his focus to Defendant. He and Agent Newport visited Defendant at Defendant's residence on April 25, 2003, and Agent Newport took a statement. On that same day, Detective Caldwell placed the plastic bag containing the hat that he had earlier received from Deputy Benton into an evidence bag and sealed it. He later gave the evidence bag containing the hat to Agent Newport for DNA testing.

On July 1, 2003, Detective Caldwell asked Defendant for a blood sample for DNA purposes related to the investigation. Defendant consented, and the blood sample was drawn in Detective Caldwell's presence. The resulting two vials of Defendant's blood were handed to Detective Caldwell, and he gave them to TBI Agent A. R. McCall for DNA testing. Detective Caldwell also obtained a DNA sample from Tim Bird.

In conjunction with investigating Defendant, Detective Caldwell spoke with Ronald Pruitt. During their initial conversation, Mr. Pruitt did not tell Detective Caldwell that he and Defendant had stopped at the victim's residence. On July 28, 2003, Detective Caldwell again spoke with Mr. Pruitt. At that time, Mr. Pruitt told him about stopping at the victim's residence with Defendant. When Detective Caldwell asked Mr. Pruitt to take him to the place that he had stopped with Defendant, Mr. Pruitt took Detective Caldwell to the victim's residence. Detective Caldwell also obtained a DNA sample from Mr. Pruitt.

On cross-examination, Detective Caldwell acknowledged that, until April 25, 2003, when he sealed into an evidence bag the hat given to him by Deputy Benton on April 10, 2003, the hat remained in the plastic bag into which Deputy Benton had put it. Detective Caldwell also acknowledged that Mr. Pruitt had told him that Defendant had beaten him up.[3] In May 2005, Mr. Pruitt accompanied Detective Caldwell and Agent Newport and showed them the victim's residence as the place that he and Defendant had stopped.

On redirect, Detective Caldwell said that Mr. Pruitt told him in May 2005 that it was nighttime when he and Defendant stopped at the victim's residence. Detective Caldwell also clarified that Mr. Pruitt directed him to the victim's residence for the first time in July 2003 and a second time in May 2005.

The parties stipulated that Roger Ball with the Cocke County Sheriff's Department would testify that he headed up the can crew and that his records indicated that the victim's son was on the can crew from January 30, 2002, until May 12, 2003; that Defendant was on the can crew from March 22, 2002, until September 12, 2002; and that Tim Bird was on the can crew from October 17, 2002, until November 15, 2002. Further, workers on the can crew would be loaded and unloaded onto vans and trucks near a location that housed Scott's Florist at one time, and that Mr. Ball had seen Ms. Lackey visiting with her son there.

The parties also stipulated (1) to the chain of custody regarding Defendant's blood samples, and (2) that on July 1, 2002, Ms. Lackey began living at the residence where she was attacked.

Agent Derek Newport of the TBI testified that he assisted in the investigation of the victim's death. He received from Detective Caldwell a plastic bag containing a hat recovered at the scene of the victim's assault. He transported it to the crime lab on May 6, 2003. He also received from Detective Caldwell a DNA sample obtained from Mr. Pruitt and a DNA sample obtained from Tim Bird, both of which he transported to the crime lab.

---

[3] We assume this testimony was elicited to demonstrate that Mr. Pruitt had a motive to lie about his activities with Defendant.

Michael Turberville testified that he works as a forensic scientist at the TBI crime laboratory, specializing in serology and DNA. He received from Detective Caldwell two vials of blood obtained from Defendant. He also received DNA samples obtained from Ronald Pruitt and Tim Bird. Finally, he received the hat recovered from the crime scene.

In processing this material, Agent Turberville obtained a "partial DNA profile" from the hat. This partial DNA profile generated information on four of nine "locations," and this limited information matched with the blood obtained from Defendant. Agent Turberville explained:

> There is a method that we use called polymerase chain reaction. What that does is [it] takes a small amount of DNA and makes millions of copies of it. It doesn't create new information, it just makes copies of what's already there, so that our instrumentation, which is called short tandem repeat, can look at that genetic profile. And we look at thirteen areas on the DNA and we can also determine if a stain came from a male or a female. And we look at these thirteen locations and try to determine if standards that we're looking at match up with the evidence from the crime scene.
>
> You'll hear me refer to markers, that's the thirteen locations on the DNA. A DNA profile would be that combination of those thirteen areas that we look at.

Testing excluded Mr. Pruitt and Mr. Bird as contributors of the DNA found on the hat. Further testing revealed "a very small trace amount of DNA from another individual" recovered from the hat. Agent Turberville testified that, statistically, the odds associated with the limited DNA match to Defendant "would essentially exclude . . . greater than ninety-nine point nine percent of the [United States Caucasian] population."

The parties stipulated to the victim's phone records for the first ten days of April 2003. They also stipulated that Callie Shelton would testify that she had known the victim for some time, having met her through Ms. Shelton's grandson, Charles David Sutton, who was a friend of the victim's son. Occasionally, Ms. Shelton's grandson would take produce to the victim while she lived at the residence where she was attacked.

On behalf of Defendant, Janie Littleton testified that she had worked at Scott's Florist and knew Ms. Lackey because she would come by frequently in conjunction with seeing her son while he was working on the can crew. She did not know if Ms. Lackey spoke with Defendant when she was visiting her son. Ms. Littleton called the victim on the evening of April 8, 2003, but did not remember their conversation.

Also on behalf of Defendant, Charles Randall Parker testified that he is Defendant's uncle. In April 2003, Defendant was living with him. Also that month, Detective Caldwell came by the house and asked Defendant for "some caps." Defendant gave the detective two shopping bags full of hats. Detective Caldwell returned the bags a few days later. Mr. Parker did not know how many hats were in the bags when they were given to the detective and did not go through the bags after they were returned.

Mr. Parker stated that he did the laundry while Defendant was living with him. In 2003, Defendant did not own any Dale Earnhardt shirts and, to his recollection, did not wear any camouflage pants.

On cross-examination, Mr. Parker testified that he did not remember Defendant having a Jeff Gordon hat at that time. He acknowledged, however, that Defendant "wore many caps" and that it was possible that Defendant had a Jeff Gordon cap.

In rebuttal, Detective Caldwell stated that the testimony about his getting hats from Defendant was "an absolute lie" and that the only hat he received during his investigation was the one recovered at the scene by Deputy Benton. Detective Caldwell acknowledged that he visited Defendant's residence on April 25, 2003, with Agent Newport, where Agent Newport took a statement from Defendant. Also in rebuttal, Agent Newport testified that, when he visited Defendant's residence in April 2003 with Detective Caldwell, they did not get any hats.

The proof was closed after Agent Newport's rebuttal testimony. The trial judge discussed jury instructions with counsel, advising them that, on the first count of the indictment, he planned to instruct the jury on the charged offense of first degree felony murder; second degree murder; reckless homicide; and criminally negligent homicide. The trial judge discussed voluntary manslaughter and concluded that the proof did not support the provocation element.[4] When the judge asked counsel if they agreed that voluntary manslaughter should not be instructed, both the prosecutor and defense counsel agreed. There was no particular discussion about second degree murder. Neither party raised an objection during the charge to the jury on second degree murder.[5]

---

[4] The offense of voluntary manslaughter is defined as "the intentional or knowing killing of another in a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner." Tenn. Code Ann. § 39-13-211(a) (2003).

[5] In sum, the trial court charged the jury on first degree felony murder; second degree murder; reckless homicide; and criminally negligent homicide.

The jury returned a verdict of second degree murder and attempted rape. The trial court sentenced Defendant to thirty-five years as a violent offender on the murder conviction and to a consecutive term of eight years on the attempted rape conviction. The Court of Criminal Appeals affirmed the trial court's judgments, with one judge dissenting and opining that Defendant's second degree murder conviction should be reduced to reckless homicide.

Defendant contends that (1) the trial court erred in permitting references to the attacker's participation in the can crew; (2) the trial court erred in admitting statements by the victim concerning the identity of her attacker; and (3) the evidence is not sufficient to support his convictions.

## Analysis

### I. Witnesses's References to "Can Crew"

Prior to trial, the defense filed a motion in limine requesting the trial court to "limit[] the State and all witnesses from making references that [Defendant] has been or was on [the] can crew or in jail shortly before this alleged offense." At the initial hearing on this motion, the State indicated that it would not be introducing proof about Defendant's participation on the can crew. The trial court did not enter an order. At a later hearing, the State indicated that it would be introducing evidence about Defendant's participation in the can crew because the two photographs shown to Ms. Lackey were obtained from the can crew roster. The defense objected, and the trial judge stated,

> [i]n looking at this testimony of somebody being on the can crew, I just don't find that to be terribly damaging. You know, it may indicate that he's done something, but we don't know what. He is probably – you would be giving him some favorable consideration that he had even been put on the can crew. That's kind of a privilege. Everybody wants to get on the can crew.

The judge added, "if that were to come in, I definitely would have to give the jury some specific instructions that absolutely no inference of any kind could be drawn from the fact that he was on the can crew."

During his opening statement, the prosecutor made reference to the can crew. After opening statements were concluded and the jury was sworn, the trial court instructed the jury as follows:

> Mention has been made about the can crew. I don't know whether anybody knows what the can crew is or not, but the only thing that I am instructing you to do is to totally disregard that fact of the Defendant being on the can crew or

-11-

anybody else being on the can crew because I am instructing you that you cannot draw any inference that would be detrimental to this Defendant from that fact. It's just part of the evidence, that's all. Do not give it anymore weight than that. It will probably be mentioned again. I don't know whether – well, my instructions will be the same. I'll not continue to interrupt, but that means nothing particularly in this case.

Later, during his testimony, Deputy Benton repeated the victim's statement to him that her attacker had been on the can crew with her son, and also explained that he obtained photographs of potential suspects from the can crew roster. Later still, after Mr. Lackey, the victim's son, testified that he had been on the can crew with Defendant and others, the trial court again admonished the jury: "I'll remind the jury of my previous admonition yesterday, that this business of the can crew, there's no inferences at all can be drawn from that. It's just simply part of the facts." Defendant complains that these references to the can crew were in violation of Tennessee Rule of Evidence 404 because they indicated to the jury that he had been incarcerated in the county jail at some point in the past.[6]

We review a trial court's decisions about the admissibility of evidence for an abuse of discretion. State v. Banks, 271 S.W.3d 90, 116 (Tenn. 2008). "Reviewing courts will find an abuse of discretion only when the trial court applied incorrect legal standards, reached an illogical conclusion, based its decision on a clearly erroneous assessment of the evidence, or employed reasoning that causes an injustice to the complaining party." Id. (citing Konvalinka v. Chattanooga-Hamilton Cnty. Hosp. Auth., 249 S.W.3d 346, 358 (Tenn. 2008)).

Tennessee Rule of Evidence 404(b) provides that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait. It may, however, be admissible for other purposes." Even if admissible for "other purposes," however, "[t]he court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice." Tenn. R. Evid. 404(b)(4). Defendant argues that the proof about his participation on the can crew was "highly" prejudicial.

---

[6] Defendant also complains that the trial court's admission of this testimony violated Tennessee Rule of Evidence 609(a), which applies to the admissibility of proof for impeachment purposes that a witness has been convicted of a crime. The record does not make clear, however, that a person's participation on the "can crew" necessarily proves a prior conviction. The record simply does not demonstrate that the various references to the can crew proved that Defendant was convicted of a crime. Moreover, Rule 609(a) applies to the impeachment of a *witness* by proof that the witness has been convicted of a crime. Defendant did not testify in this case and was therefore not a witness subject to impeachment pursuant to Rule 609(a). Rule 609(a) is therefore inapposite to this issue.

We disagree. First, the prosecutor's and the witnesses's references to the can crew were ambiguous and did not clearly indicate that Defendant had previously engaged in a crime or other wrongful act. Second, the references to the can crew were not elicited to prove a character trait possessed by Defendant but were elicited in conjunction with establishing the perpetrator's identity. Evidence of prior wrongs may be admissible for the purpose of proving identity. Tenn. R. Evid. 404(b), Advisory Comm'n Comments; State v. Kiser, 284 S.W.3d 227, 288 app. (Tenn. 2009). Third, the proof demonstrated that Deputy Benton's use of the can crew information and photographs resulted in the victim identifying someone other than Defendant as her possible assailant, thereby helping rather than prejudicing Defendant in his claim that he was not the perpetrator. Finally, the trial court properly instructed the jury not to draw any inferences about Defendant from the references to the can crew, and the jury is presumed to follow the court's instructions. Kiser, 284 S.W.3d at 272; State v. Shaw, 37 S.W.3d 900, 904 (Tenn. 2001). The trial court did not abuse its discretion in admitting this testimony, and Defendant is not entitled to relief on the basis of this issue.

## II. Admission of Victim's Statements

We next address Defendant's contention that the trial court erred in admitting testimony by Mr. Trentham, Ms. Ellison, Ms. Cogdill, and Deputy Benton about statements Ms. Lackey made after her attack. Of course, the victim's statements to these persons were hearsay. See Tenn. R. Evid. 801(c). Prior to trial, the defense filed a motion in limine seeking to prevent testimony about Ms. Lackey's statements concerning the attack. After a hearing, the trial court denied Defendant's motion. Defendant argues that the trial court's admission of this testimony violated his federal and state constitutional rights to confront witnesses. We review this question of law de novo. State v. Lewis, 235 S.W.3d 136, 141 (Tenn. 2007).

The Sixth Amendment to the United States Constitution provides that the accused in a criminal prosecution "shall enjoy the right . . . to be confronted with the witnesses against him[.]" U.S. Const. amend. VI. Similarly, article I, section 9 of the Tennessee Constitution provides that, "in all criminal prosecutions, the accused hath the right . . . to meet the witnesses face to face[.]" Tenn. Const. art. I, § 9. Although the two provisions are worded differently, "this Court has largely adopted the standards used by the United States Supreme Court . . . in determining whether the Tennessee constitutional right has been violated." State v. Maclin, 183 S.W.3d 335, 343 (Tenn. 2006). Currently, Crawford v. Washington, 541 U.S. 36 (2004), and its progeny are the controlling authority for determining whether the admission of hearsay violates a defendant's rights under the federal confrontation clause, and this Court has applied Crawford to challenges under the Tennessee Constitution, as well. See, e.g., Lewis, 235 S.W.3d at 142-52; Maclin, 183 S.W.3d at 344-52.

-13-

Obviously, one cannot confront a dead witness about his or her hearsay statements. Neither the federal nor the state confrontation clause prohibits the admission of all hearsay declarations by unavailable witnesses, however. Rather, only "testimonial" hearsay statements by the unavailable witness create the risk of a constitutional violation. See Davis v. Washington, 547 U.S. 813, 821 (2006); Crawford, 541 U.S. at 68. Thus, the threshold issue for an alleged confrontation clause violation is "whether a challenged statement is testimonial or nontestimonial." Maclin, 183 S.W.3d at 345.

In Davis, decided after Crawford, the United States Supreme Court set forth the following analysis for making the distinction between testimonial and nontestimonial statements:

> Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.

Davis, 547 U.S. at 822. This Court has applied this test to determine challenges under our state constitution's confrontation clause as well. See State v. Franklin, 308 S.W.3d 799, 812-22 (Tenn. 2010); State v. Cannon, 254 S.W.3d 287, 302-05 (Tenn. 2008); Lewis, 235 S.W.3d at 143-47.[7]

In Franklin, we noted that some existing law supports the proposition that "statements between private parties unconnected to law enforcement . . . are [categorically] nontestimonial." Franklin, 308 S.W.3d at 816. The United States Supreme Court has still not decided this issue so we will continue to define testimonial only to the extent necessary to resolve the case before us. Thus, in Franklin we emphasized that "considering the intent both of a reasonable person in the declarant's position and of a reasonable person in the questioner's position" is the approach most consistent with Crawford, Davis, and our own decisions. Franklin, 308 S.W.3d at 817-18. We also reiterated the relevance of the non-exclusive list of factors we initially set forth in Maclin for determining whether a particular statement is testimonial:

---

[7] Since Davis, the Supreme Court has issued Michigan v. Bryant, 562 U.S. __, 131 S. Ct. 1142 (2011), in which it considered in more detail the fact-intensive analysis that courts should bring to bear in determining whether the primary purpose of an interrogation of a victim by police officers is to respond to an ongoing emergency, thereby eliciting nontestimonial statements.

-14-

(1) whether the declarant was a victim or an observer; (2) whether contact was initiated by the declarant or by law-enforcement officials; (3) the degree of formality attending the circumstances in which the statement was made; (4) whether the statement was given in response to questioning, whether the questioning was structured, and the scope of such questioning; (5) whether the statement was recorded (either in writing or by electronic means); (6) the declarant's purpose in making the statements; (7) the officer's purpose in speaking with the declarant; and (8) whether an objective declarant under the circumstances would believe that the statements would be used at a trial.

Franklin, 308 S.W.3d at 813 (quoting Maclin, 183 S.W.3d at 349). These factors are to be considered in order to determine whether the statement's primary purpose "'is to establish or to prove past events potentially relevant to later criminal prosecutions' [or is] to resolve an ongoing emergency or for some other purpose." Franklin, 308 S.W.3d at 818 (quoting Cannon, 254 S.W.3d at 303). See also Michigan v. Bryant, 562 U.S. __, __, 131 S. Ct. 1142, 1162 (2011) (holding that, "when a court must determine whether the Confrontation Clause bars the admission of a statement at trial, it should determine the 'primary purpose of the interrogation' by objectively evaluating the statements and actions of the parties to the encounter, in light of the circumstances in which the interrogation occurs. The existence of an emergency or the parties' perception that an emergency is ongoing is among the most important circumstances that courts must take into account in determining whether an interrogation is testimonial because statements made to assist police in addressing an ongoing emergency presumably lack the testimonial purpose that would subject them to the requirement of confrontation. . . . [T]he existence and duration of an emergency depend on the type and scope of danger posed to the victim, the police, and the public").

We turn, then, to determining whether each of Ms. Lackey's hearsay statements was testimonial or nontestimonial in nature.

*A. Victim's Statements to Mr. Trentham*

The Court of Criminal Appeals held that Ms. Lackey's statements to Mr. Trentham were nontestimonial. We agree. The victim indicated to Mr. Trentham that she had just escaped her apartment after her assailant heard a noise and left her bedroom to investigate. She was naked from the waist down, reflecting her hurry, and "scared to death." The victim's appearance and statements implied that she feared her attacker might still be on the premises and that her emergency was ongoing. As recited by the Court of Criminal Appeals, "[t]he victim was speaking to her neighbor directly after escaping an attack, and there was no indication she expected the statements to be used in the investigation or prosecution of her attacker." State v. Parker, No. E2008-02541-CCA-R3-CD, 2010 WL 3706090, at *15 (Tenn. Crim. App. Sept. 22, 2010). As we recognized in Franklin, there is "a growing

-15-

consensus that statements establishing the identity of the perpetrator are nontestimonial when made in informal settings during the immediate aftermath of a crime." Franklin, 308 S.W.3d at 820. Thus, we held in Franklin that the license number of the vehicle driven by the perpetrator provided to a robbery victim by a private citizen immediately after the crime was nontestimonial hearsay. Id. at 804, 822. See also, e.g., State v. Slater, 939 A.2d 1105, 1114-15 (Conn. 2008) (crying victim's statement to two private citizens on street that "a black male with a big knife just raped her" was not testimonial because the victim "clearly was seeking aid" and the citizens' response in taking the victim inside and calling the police indicated that their primary purpose was to aid her). The same result obtains regarding the victim's statements to Mr. Trentham.

Hearsay statements deemed nontestimonial may properly be admitted under a recognized exception to the hearsay rule. See Bryant,131 S. Ct. at 1155 (recognizing that, where the primary purpose of an interrogation renders the resulting declarations nontestimonial, "the admissibility of a statement is the concern of state and federal rules of evidence, not the Confrontation Clause"). In pretrial proceedings, the defense conceded that the victim's statements to Mr. Trentham fell within the hearsay exception for excited utterances. See Tenn. R. Evid. 803(2).[8] As did the Court of Criminal Appeals, we agree and hold that the trial court committed no error in admitting Mr. Trentham's testimony about the victim's statements to him.

### B. Victim's Statements to Ms. Ellison

Ms. Ellison was the emergency medical technician who arrived on the scene in response to the 911 call. Ms. Lackey told Ms. Ellison what her assailant had done, and she also identified the hat found on her bed as her attacker's. The trial court ruled that this testimony was nontestimonial and that it was admissible as an excited utterance. Although the defense challenged this ruling before the Court of Criminal Appeals and again before this Court, this issue was not raised in Defendant's motion for new trial. We agree with the intermediate appellate court that this issue has therefore been waived. See Tenn. R. App. P. 3(e); State v. Hatcher, 310 S.W.3d 788, 808 (Tenn. 2010); State v. Keel, 882 S.W.2d 410, 416 (Tenn. Crim. App. 1994). Defendant does not argue that this allegedly erroneous ruling by the trial court rises to the level of plain error, and we decline to address it as such.

---

[8] An "excited utterance" not excluded by the hearsay rule is "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." Tenn. R. Evid. 803(2).

### C. Victim's Statements to Ms. Cogdill

Ms. Cogdill was the registered nurse who attended to Ms. Lackey at the emergency room. She testified that the victim told her that an assailant had tried to rape her with his hand, had choked her, and had "put her to the ground and then bent her legs up over her head." The victim also reported a headache to Ms. Cogdill. We agree with the Court of Criminal Appeals that these statements were made for the purpose of obtaining medical treatment and were nontestimonial. See Cannon, 254 S.W.3d at 303-04 (holding that rape victim's statements to emergency room personnel about the rape were nontestimonial); see also Melendez-Diaz v. Massachusetts, __ U.S. __, 129 S. Ct. 2527, 2533 n.2 (2009) ("[M]edical reports created for treatment purposes . . . would not be testimonial under our decision today."). The trial court admitted properly this testimony pursuant to the hearsay exception for statements made for medical diagnosis and treatment. See Tenn. R. Evid. 803(4).[9]

Ms. Cogdill also testified that Ms. Lackey told her that her attacker was a friend of her son's. We agree with the Court of Criminal Appeals' analysis of Defendant's complaint about this testimony:

> Before trial, the State and defense counsel agreed that only the portions of the victim's statements at the emergency room directly related to her treatment would be admitted. The parties agreed to exclude statements related to the identity of the attacker. However, at trial, the prosecutor asked Ms. Cogdill what the victim told her at the hospital, and she responded, "Was attempted to be raped by son's friend . . . ." The defense did not object, although the issue was raised in the motion for new trial. Without determining whether the Defendant waived the issue by failing to object contemporaneously, we hold that any error in admitting this evidence was harmless. The jury had already heard Mr. Trentham's testimony that the victim "kept saying that it was somebody on a can crew that her son knew." The evidence in question did not add any new information. See T[enn.] R. A[pp.] P. 36(b).

Parker, 2010 WL 3706090, at *18. Defendant is not entitled to any relief on this issue.

---

[9] Statements "made for purposes of medical diagnosis and treatment" that are not excluded by the hearsay rule are those "describing medical history; past or present symptoms, pain, or sensations; or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis and treatment." Tenn. R. Evid. 803(4).

*D. Victim's Statements to Deputy Benton*

Deputy Benton arrived at Mr. Trentham's apartment in response to Mr. Trentham's 911 call. Answering the deputy's questions about what had occurred, Ms. Lackey told him about how her assailant had attacked her and described him, according to Deputy Benton, as "a white male, approximately five foot nine, long black hair with a goatee, wearing camouflaged pants, . . . [with] a tear in the right leg and . . . a white Dale Earnhardt shirt." Ms. Lackey also told Deputy Benton that she had recognized her assailant because he "had been on the can crew with her son." When Deputy Benton accompanied Ms. Lackey to her apartment, she identified to him the hat on her bed as belonging to her assailant.

Ms. Lackey's statements to Deputy Benton were testimonial, and the State concedes this point in its brief to this Court. By the time Ms. Lackey was speaking with Deputy Benton, there was no longer an ongoing emergency. Ms. Lackey was describing past events to a law enforcement officer and she was answering questions designed to help apprehend her attacker. As recognized by the intermediate appellate court, this aspect of this case is very similar to the Crawford issue presented in Lewis.

In Lewis, an assailant shot the owner of an antiques store during a robbery attempt. Hearing a disturbance in the store, some employees of the business next door came to investigate. They found the owner lying on the floor, shot. Responding to the 911 call, Detective Chastain arrived at the store while the owner was still lying on the floor, bleeding. By this time, the shooter had fled in a car driven by the female defendant. Detective Chastain asked the owner a series of questions about what had happened, and the owner described his assailant as a young black man. After medical assistance arrived and treatment had begun, the owner called to Detective Chastain and pointed, saying "the lady's information is on the desk." On further questioning, the owner claimed that "the lady" was connected with the robbery and shooting. On the owner's desk was a piece of paper with the defendant's name on it. The owner later died of his gunshot wounds. See Lewis, 235 S.W.3d at 139-40.

This Court determined that the victim's statements to Detective Chastain implicating the defendant were testimonial:

The assailant had left the store. The victim had talked to [the next door employees] who were first to arrive at the scene. The 911 call had already been made. In Davis, the Court pointed out that "the fact that [statements were] given at an alleged crime scene and were 'initial inquiries' is immaterial." [547 U.S. at 832]. While the victim's statements here took place at the crime scene, they were responses to inquiries by the investigating officers. Even though the victim was in a state of distress from his wounds, his comments did not describe an "ongoing emergency," as defined in

-18-

Crawford, and were instead descriptions of recent, but past, criminal activity as in Hammon[, the companion case to Davis].

Lewis, 235 S.W.3d at 147 (footnote omitted). Similarly, Ms. Lackey's statements to Deputy Benton were made after the 911 call had been made; after Ms. Lackey had already spoken with Mr. Trentham; after her assailant had left the premises; and they were made in response to questions by Deputy Benton aimed at discovering who the assailant was for apprehension purposes. Ms. Lackey's statements to Deputy Benton were descriptive of past criminal activity and were not addressed to responding to an "ongoing emergency."

Where the statements at issue are testimonial hearsay, the confrontation clause prohibits their admission unless (1) the declarant is unavailable, and (2) the defendant has been provided a previous opportunity to cross-examine the declarant. Crawford, 541 U.S. at 53-54; Lewis, 235 S.W.3d at 146. Here, Ms. Lackey became unavailable upon her death the day after she was attacked. Defendant had no opportunity to cross-examine her prior to her death. The trial court erred in allowing Deputy Benton to testify about the statements that Ms. Lackey made to him.

The trial court's error violated Defendant's constitutional rights under the federal and state confrontation clauses. However, "[t]he erroneous admission of testimony in violation of an accused's right of confrontation is not structural error mandating reversal." Cannon, 254 S.W.3d at 306. Rather, we review for constitutional harmless error, and reversal is not required "if the State proves beyond a reasonable doubt that the error did not affect the verdict at trial." Id. at 306-07. "An assessment of harmlessness cannot include consideration of whether the witness' testimony would have been unchanged, or the jury's assessment unaltered, had there been confrontation; such an inquiry would obviously involve pure speculation, and harmlessness must therefore be determined on the basis of the remaining evidence." Coy v. Iowa, 487 U.S. 1012, 1021-22 (1988).

We agree with the Court of Criminal Appeals that the State has carried its burden of demonstrating harmless error beyond a reasonable doubt in this case. Deputy Benton testified that, when he accompanied the victim back to her apartment, he found her bedroom in disarray. He collected as evidence a hat found on the victim's bed. Subsequent DNA analysis indicated that Defendant had been in contact with this hat at some point. Mr. Pruitt testified that he took Defendant to Ms. Lackey's residence and that Defendant entered her residence, ostensibly to borrow money. Defendant remained inside for fifteen to twenty minutes. Mr. Trentham testified that Ms. Lackey told him that her attacker was "someone her son knew." Ms. Lackey's son testified that he knew Defendant. Ms. Lackey told medical personnel that her attacker had tried to rape her with his hand, had choked her, and had "put her to the ground and then bent her legs up over her head." Medical proof established that Ms. Lackey died from a subdural hematoma suffered on the night she was attacked, caused

-19-

by a sudden deceleration of her head. Had the jury heard only this proof, without Deputy Benton's testimony about Ms. Lackey's statements describing her attacker and telling him that the hat on her bed belonged to her attacker, we are convinced beyond a reasonable doubt that it would have convicted Defendant as it did. Defendant is therefore entitled to no relief on this issue.

## III. Sufficiency of the Evidence

### *A. Waiver*

We turn now to Defendant's primary claim that the evidence does not support his convictions. As a preliminary matter, we must address the State's contention that Defendant has waived his right to challenge his second degree murder conviction because he did not object to the jury being charged with second degree murder as a lesser-included offense of first degree felony murder. We do not read Defendant's challenge to his conviction so narrowly. Defendant is complaining that the evidence is not sufficient to support his conviction of second degree murder. While Defendant may certainly have avoided the conviction had he convinced the trial court that the second degree murder instruction was not warranted by the proof, his failure to object at trial does not constitute a waiver of his right to challenge the sufficiency of the evidence. Cf. State v. Bough, 152 S.W.3d 453, 460 (Tenn. 2004) (recognizing that sufficiency of the evidence may be challenged even absent a timely motion for new trial); Wallace v. State, 121 S.W.3d 652, 655 n.4 (Tenn. 2003) ("Pursuant to Tennessee Rule of Appellate Procedure 3(e), issues not specifically raised in a timely motion for a new trial, *other than sufficiency of the evidence*, are not reviewed on appeal.") (emphasis added); State v. Durham, 614 S.W.2d 815, 816 n.1 (Tenn. Crim. App. 1981) (same). We will address on the merits Defendant's challenge to the sufficiency of the evidence regarding his second degree murder conviction.

### *B. Standard of Review*

When evaluating the sufficiency of the evidence, we must determine whether "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979) (emphasis omitted). In making this determination, we afford the prosecution the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences which may be drawn therefrom. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). Questions concerning the credibility of the witnesses, the weight to be given the evidence, and factual issues raised by the evidence are resolved by the trier of fact. Id. Because a verdict of guilt removes the presumption of innocence and imposes a presumption of guilt, the defendant upon conviction bears the burden of showing why the evidence is insufficient to support the verdict. State v. Rice, 184 S.W.3d 646, 661 (Tenn. 2006); State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). This standard of review

is identical whether the conviction is predicated on direct or circumstantial evidence. State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011); State v. Brown, 551 S.W.2d 329, 331 (Tenn. 1977).

## C. Second Degree Murder

Second degree murder is defined as "[a] knowing killing of another." Tenn. Code Ann. § 39-13-210(a)(1) (2003). To establish that a defendant committed a second degree murder, the State has the burden of proving beyond a reasonable doubt that (1) the defendant killed the victim, and (2) the defendant committed the killing with a "knowing" state of mind. With respect to the first element, the medical proof in this case established that the victim died of a subdural hemorrhage. Dr. Mileusnic-Polchan opined that

> The cause for subdural hemorrhage particularly in this age population [to which the victim belonged] is trauma, blunt trauma to the head. It could be a blow, it could be a fall and could be also any mechanism that is going to her head to perform like a sudden deceleration, meaning she was moving and maybe kind of hitting a hard surface, or any surface for that matter that is going to decelerate the head, meaning the brain is starting to – or continuing to move with the blood vessels, the head stops suddenly and the deceleration injury stretches the bridging veins and causes the tearing of the veins that leads to the subdural bleeding.

Dr. Mileusnic-Polchan also opined that the injury occurred during the evening of April 8, 2003, the night on which Ms. Lackey was attacked. Ms. Cogdill testified that the victim told her that her attacker had choked her, "put her to the ground," and lifted her legs up. After the attack, the victim complained of a headache. This proof, taken in the light most favorable to the State, is sufficient to establish that the perpetrator caused the head injury from which the victim later died. That is, this proof is sufficient to establish the first element of second degree murder.

A more troubling issue is whether the proof is sufficient to establish that the perpetrator acted "knowingly" in causing the victim's death. Our criminal code provides that

> '[k]nowing' refers to a person who acts knowingly with respect to the conduct or to circumstances surrounding the conduct when the person is aware of the nature of the conduct or that the circumstances exist. A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result.

Tenn. Code Ann. § 39-11-302(b) (2003). Because this Court has determined that "[s]econd degree murder is a result of conduct offense," State v. Brown, 311 S.W.3d 422, 431-32 (Tenn. 2010), "[t]he 'nature of the conduct' that causes death or the manner in which one is killed is inconsequential under the second degree murder statute. The statute focuses purely on the result and punishes an actor who knowingly causes another's death." State v. Ducker, 27 S.W.3d 889, 896 (Tenn. 2000). Thus, the proof to support the mens rea element of second degree murder needs to demonstrate beyond a reasonable doubt only that the accused "knew that his or her actions were reasonably certain to cause the victim's death." Brown, 311 S.W.3d at 432.

The Court of Criminal Appeals "agree[d] with . . . Defendant that the proof did not establish a knowing mens rea for the victim's murder." Parker, 2010 WL 3706090, at *12. We also agree that there is simply not enough proof in the record to establish that Defendant acted "knowingly" with respect to causing a fatal injury to the victim. The only proof that he caused a head injury to the victim are the victim's reports that Defendant "put her to the ground" and that she subsequently suffered a headache. A reasonable inference from this proof is that, during the attack, the victim struck her head on the floor with sufficient force to cause the fatal injury. There is no proof in the record, however, indicating that Defendant was aware that his treatment of Ms. Lackey was "reasonably certain" to cause her death. For instance, there is no proof whatsoever that Defendant deliberately slammed Ms. Lackey's head onto a hard surface in an accelerated manner. Indeed, the autopsy indicated no wounds to the exterior of Ms. Lackey's head that might be expected from such treatment. Additionally, there is no proof in the record that simply pushing someone to the floor, even someone sixty-five years old, is reasonably certain to cause their death. To the contrary, Dr. Mileusnic-Polchan testified that, ordinarily, a fall would not produce the type of subdural hemorrhage that killed the victim, and that Ms. Lackey's age made her only slightly more vulnerable to the fatal injury she suffered. Thus, we agree that there is not sufficient proof in the record to establish that Defendant "knowingly" killed the victim. Because of the posture of this case, however, this conclusion does not end our inquiry.

Defendant was not convicted on an indictment of second degree murder. Indeed, although the State initially charged Defendant with alternative counts of felony murder and second degree murder, the State apparently dismissed or withdrew the second degree murder charge prior to trial.[10] Rather, Defendant was convicted of second degree murder because it was charged to the jury by the trial court as a lesser-included offense of first degree felony murder. See State v. Ely, 48 S.W.3d 710, 722 (Tenn. 2001). The issue before us is whether, in spite of insufficient evidence to support the offense of second degree murder, the

_____

[10] The State recites in its brief to this Court that, "[a]lthough no order appears in the record, the second degree murder indictment was apparently dismissed prior to trial."

-22-

conviction should nevertheless be affirmed because there was sufficient evidence to support the greater offense of felony murder.[11]

The majority of the Court of Criminal Appeals panel that considered this issue concluded that Defendant's conviction of second degree murder "survive[d] despite the deficient proof of its elements." Parker, 2010 WL 3706090, at *12. In so doing, the intermediate appellate court relied on this Court's decision in State v. Mellons, 557 S.W.2d 497 (Tenn. 1977).

### 1. State v. Mellons

In Mellons, the defendant was charged with two counts of second degree murder. The two victims had been riding in a car that the intoxicated defendant was driving and were killed when the defendant drove into a guard rail, causing the car to flip and land on its roof in a shallow creek. The trial court instructed the jury on second degree murder, voluntary manslaughter, and involuntary manslaughter. The jury convicted the defendant of two counts of voluntary manslaughter. Mellons, 557 S.W.2d at 498.

At the time of the offenses, manslaughter was defined as "'the unlawful killing of another without malice, either express or implied, which may be either voluntary upon a sudden heat, or involuntary, but in the commission of some unlawful act,'" id. at 499 (quoting Tenn. Code Ann. § 39-2409 (1955)), and was a "lesser degree of homicide than second degree murder," id.[12] This Court concluded that there was "no evidence" to support the "sudden heat" element of voluntary manslaughter. Id. This Court also concluded, however, that the lack of evidence did not, in and of itself, require that the convictions for voluntary manslaughter be reversed, relying on Tennessee Code Annotated section 40-2520. Id. That statute provided that, "[u]pon an indictment for any offense consisting of different degrees, the jury may find the defendant not guilty of the degree charged in the indictment and guilty of any degree inferior thereto . . . ." Tenn. Code Ann. § 40-2520 (1955) (repealed 1979).

---

[11] First degree felony murder, as charged in this case, is defined as the "killing of another committed in the . . . attempt to perpetrate any . . . rape." Tenn. Code Ann. § 39-13-202(a)(2) (2003). The jury determined that Defendant committed an attempted rape and also determined that Defendant killed the victim. The proof was therefore sufficient to have supported a felony murder conviction, had the jury chosen to find Defendant guilty of that offense.

[12] The crime of voluntary manslaughter is currently codified at Tennessee Code Annotated section 39-13-211 (2010) and is defined as "the intentional or knowing killing of another in a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner." The Tennessee criminal code no longer contains a crime designated "involuntary manslaughter."

-23-

Noting that instructions on offenses not supported by the evidence should be "avoided," this Court nevertheless declared that,

the giving of such an instruction, even though it results in conviction of a lesser included offense not supported by the evidence, though error, is not necessarily reversible error. On appeal, a conviction of a lesser degree of the crime charged, or of a lesser included offense, will be upheld, even if there is no evidence in the record to establish the technical elements of that crime, if the evidence demands a conviction of a higher degree of homicide than that found by the verdict, and there is either no evidence in support of acquittal of the greater crime, or if there is, the verdict of the jury clearly indicates that the evidence in support of acquittal was disbelieved, on the theory that the defendant was not prejudiced by the charge and the resulting verdict.

Mellons, 557 S.W.2d at 499. Significantly, the Mellons Court nevertheless reversed the defendant's convictions of voluntary manslaughter[13] on the basis that there was

reason to believe that the giving of instructions on voluntary manslaughter *did* prove prejudicial to the defendant. This was not a situation in which the defendant was guilty either of the greater crime charged or of no crime at all, so that the jury's verdict, finding him guilty of the lesser degree of homicide, could best be understood as an act of mercy of which he would not be heard to complain. Here, the jury would have been fully justified, under the evidence, in returning a verdict of guilty of involuntary manslaughter. That the jury chose to sentence the defendant to the statutory minimum for voluntary manslaughter suggests that they would not have found the defendant guilty of second degree murder if given the choice, as they should have been, between that crime and involuntary manslaughter. Under the circumstances, . . . the conviction of the defendant of the crime of voluntary manslaughter must be set aside.

Id. at 499-500 (emphasis added) (citations omitted). The Court remanded the case for retrial on two charges of involuntary manslaughter. Id. at 500.

In retrospect, it is difficult to discern the precise proposition for which Mellons stands. The proposition for which the majority below relied on it is, in fact, mere dictum. Mellons

---

[13] The majority opinion of the Court of Criminal Appeals is mistaken in its assertion that the Mellons Court "upheld the defendant's conviction of voluntary manslaughter, even though no proof existed that the defendant committed the killings 'upon a sudden heat.'" Parker, 2010 WL 3706090, at *12.

-24-

actually held that the trial court committed reversible error in charging a lesser-included offense not supported by the proof because the defendant was thereby prejudiced. Because the jury was instructed as to both voluntary and involuntary manslaughter, this holding presumes that the jury unanimously decided to convict the defendant of voluntary manslaughter (the "greater" of the two manslaughter offenses) and therefore did not consider the next-lesser offense of involuntary manslaughter. See State v. Davis, 266 S.W.3d 896, 908 (Tenn. 2008) (recognizing that trial courts in Tennessee have for many years instructed juries to consider the next-lesser offense only after unanimously deciding to acquit of the preceding "greater" offense). Thus, the jury in Mellons did not consider a proper lesser-included offense because it was *erroneously* given a charge on a "greater" lesser-included offense that was not supported by the proof.

## 2. Viability of Mellons

Not only is the actual language of Mellons problematic, its viability is questionable in light of subsequent developments in the law. As noted by Judge David Hayes,[14] "the rationale of Mellons was expressly predicated upon then Tennessee Code Annotated [section] 40-2520, which was repealed in 1979." State v. Mason, No. M2002-01709-CCA-R3-CD, 2004 WL 1114581, at *11 (Tenn. Crim. App. May 19, 2004) (Hayes, J., dissenting). Neither section 40-2520 nor any statute like it applied at the time Defendant committed his offenses or was tried for them. Moreover, since Mellons, the United States Supreme Court has stated unequivocally that

> an essential of the due process guaranteed by the Fourteenth Amendment [is] that no person shall be made to suffer the onus of a criminal conviction except upon sufficient proof – defined as evidence necessary to convince a trier of fact beyond a reasonable doubt of the existence of *every element* of the offense.

Jackson, 443 U.S. at 316 (emphasis added). Thus, when reviewing a convicted defendant's claim that the evidence is not sufficient to support his or her conviction, the review must be undertaken with respect to the crime of which the defendant was convicted, not the crime with which he was charged. See id. at 324 n.16 (stating that the standard of review "must be applied with explicit reference to the substantive elements of the criminal offense [challenged] as defined by state law"). That the proof may support conviction of a different, even a "greater," offense does not obviate the constitutional requirement that the proof support each and every element of the offense for which the defendant was *actually* convicted. And, contrary to the Mellons Court's rationale that a defendant suffers no

---

[14] Judge Hayes has since retired from the Tennessee Court of Criminal Appeals.

prejudice when convicted of a lesser offense where the proof supports a greater offense, even if the lesser is *not* supported by the proof, the Supreme Court in Jackson observed that "[t]he power of the [jury] to err upon the side of mercy . . . has never been thought to include a power to enter an unreasonable verdict of guilty." Jackson, 443 U.S. at 317 n.10.

Also taking effect since Mellons is Tennessee Rule of Appellate Procedure 13(e)[15] which provides unequivocally that "[f]indings of guilt in criminal actions whether by the trial court or jury *shall* be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt." Tenn. R. App. P. 13(e) (emphasis added). No exception is made for lesser-included offenses erroneously charged and not supported by the proof, even where the proof may be sufficient to support the greater, correctly charged, offense. See id.

Additionally, since Mellons this Court has decided the landmark case of State v. Burns, 6 S.W.3d 453 (Tenn. 1999), which, with its progeny, has altered dramatically the landscape of lesser-included offenses. At the time Mellons was decided, Tennessee had "yet to adopt a definitive position on th[e] question" of when and what lesser-included offenses should be charged. Howard v. State, 578 S.W.2d 83, 85 (Tenn. 1979). The Court in Howard determined that "an offense is necessarily included in another if the elements of the greater offense, as those elements are set forth in the indictment, include, but are not congruent with, all the elements of the lesser. *If there is evidence to support a conviction for such a lesser offense*, it must be charged" to the jury. Id. (emphasis added). Howard was the defining case for determining lesser-included offense issues until 1999, when this Court decided Burns.

In Burns, we adopted the following test for determining whether one offense was a lesser-included offense of another:

> An offense is a lesser-included offense if:
> (a) all of its statutory elements are included within the statutory elements of the offense charged; or
> (b) it fails to meet the definition in part (a) only in the respect that it contains a statutory element or elements establishing
>> (1) a different mental state indicating a lesser kind of culpability; and/or
>> (2) a less serious harm or risk of harm to the same person, property or public interest; or
> (c) it consists of

---

[15] The Tennessee Rules of Appellate Procedure were adopted in 1978.

(1) facilitation of the offense charged or of an offense that otherwise meets the definition of lesser-included offense in part (a) or (b); or

(2) an attempt to commit the offense charged or an offense that otherwise meets the definition of lesser-included offense in part (a) or (b); or

(3) solicitation to commit the offense charged or an offense that otherwise meets the definition of lesser-included offense in part (a) or (b).

Burns, 6 S.W.3d at 466-67. Additionally, we made clear that

whether a lesser-included offense must be charged in a jury instruction is a two-part inquiry: first, whether the lesser offense is included in the greater under the test adopted, and second, *whether a charge is justified by the evidence*. The second step of the analysis adopted in Burns requires a determination of (a) whether any evidence exists that reasonable minds could accept to prove the existence of a lesser-included offense, and (b) *whether the evidence is legally sufficient to support a conviction for the lesser-included offense*.

Ely, 48 S.W.3d at 722 (citing Burns, 6 S.W.3d at 467, 469) (emphases added) (citation omitted). Our General Assembly has echoed our holding in Burns with its passage of Tennessee Code Annotated section 40-18-110, which provides in pertinent part that a

trial judge *shall not instruct the jury* as to any [lesser included] offense unless the judge determines that the record contains any evidence which reasonable minds could accept as to the lesser included offense. In making this determination, the trial judge shall view the evidence liberally in the light most favorable to the existence of the lesser included offense without making any judgment on the credibility of such evidence. The trial judge shall also determine whether the evidence, viewed in this light, is *legally sufficient* to support a conviction for the lesser included offense.

Tenn. Code Ann. § 40-18-110(a) (2003) (emphases added).

With specific reference to felony murder, we determined in Ely that, as a general matter, "the offenses of second degree murder, reckless homicide, and criminally negligent homicide are lesser-included offenses of felony murder." Ely, 48 S.W.3d at 721-22. However, when considering whether the trial court had erred in failing to charge the jury

with any of these lesser-included offenses, we closely examined the records in Ely and its companion case of State v. Bowers to determine whether the proof supported the elements of each of these crimes. See id. at 723-25.

With the elimination of the statutory support upon which Mellons relied, combined with the subsequent significant developments in our lesser-included offense jurisprudence and statutes, we are forced to conclude that Mellons does not control the outcome of this case. Rather, we hold that a court reviewing the sufficiency of the evidence must determine whether each element of the conviction offense is supported by sufficient proof. If the proof does not adequately support each and every element, the defendant is entitled to a reversal of the conviction. As a more general matter, we hold that a defendant may challenge the sufficiency of the evidence where he or she is convicted of a lesser-included offense charged to the jury, whether or not the proof is sufficient to support the primary offense. To sustain a conviction of a lesser-included offense, the proof must be sufficient to support each and every element of the conviction offense. To the extent that Mellons and its progeny hold to the contrary, they are overruled.

Sound policy reasons buttress our holding. Had Defendant been indicted for, and convicted of, second degree murder, his conviction would be reversed for insufficient evidence. A contrary result should not obtain from the trial court's error in charging a lesser-included offense not supported by the proof. To allow a conviction to stand when obtained as a lesser-included offense where it would be reversed as a primary offense is not only inconsistent, it is also contrary to our commitment to full, fair, and accurate jury instructions. We decline to adopt such an approach.

Moreover, we agree with Judge Hayes that trial judges have "the responsibility for safeguarding the integrity of the jury trial" which "includes withholding lesser offenses from the jury when the evidence is not legally sufficient to support a conviction for such offense." Mason, 2004 WL 1114581, at *12 (Hayes, J., dissenting).

There is no question that the trial court erred in instructing the jury on second degree murder under the facts of this case. The issue is whether the error is reversible. We conclude that it is. We acknowledge that, citing Mellons, we have stated as recently as 1996 that "[i]t is well-settled that when a jury is instructed as to a lesser included offense of that charged in the indictment, a conviction of the lesser included offense may stand, even if the technical requirements of that offense are not present, if the evidence supports the greater offense." State v. Bolin, 922 S.W.2d 870, 875 (Tenn. 1996). As in Mellons, however, this Court did not actually hold in Bolin that a defendant may stand convicted of a lesser-included offense *where there is no proof as to an element necessary to support the lesser-included offense*, even if the proof would support the greater offense. Rather, where a trial court *properly*

-28-

instructs the jury on lesser-included offenses, and the jury thereupon convicts the defendant of a lesser-included offense, the defendant will not later be heard to complain. See Bolin, 922 S.W.2d at 875 (affirming a conviction of aggravated sexual battery charged as lesser-included offense of aggravated rape where the proof allowed the jury to believe testimony establishing sexual contact and to reject testimony establishing sexual penetration).

### 3. Reckless Homicide

While the proof in this case is not sufficient to support Defendant's conviction of second degree murder, it *is* sufficient to support a conviction of reckless homicide. Our criminal code defines reckless homicide as the "reckless killing of another," Tenn. Code Ann. § 39-13-215(a) (2003), and provides that

> "[r]eckless" refers to a person who acts recklessly with respect to . . . the result of the conduct when the person is aware of but consciously disregards a substantial and unjustifiable risk that . . . the result will occur. The risk must be of such a nature and degree that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the accused person's standpoint.

Id. § 39-11-302(c) (2003).[16] Certainly, the proof demonstrates that Defendant acted with reckless disregard when he choked and pushed down Ms. Lackey, who was very slight in build and who appeared even older than her age of sixty-five, resulting in the subdural hematoma that killed her. Accordingly, we reverse and vacate Defendant's conviction of second degree murder and remand to the trial court for amendment of the judgment order to reflect a conviction of reckless homicide. See, e.g., United States v. Dhinsa, 243 F.3d 635, 674-75 (2d Cir. 2001) (recognizing that an appellate court may vacate a conviction for a greater offense and enter a judgment of conviction on a lesser offense where the evidence is insufficient to support the greater but sufficient to support the lesser where the reviewing court "is convinced that the defendant will not be prejudiced as a result"); State v. Brown, 836 S.W.2d 530, 533, 554 (Tenn. 1992) (entering a judgment on the lesser-included offense of second degree murder where the evidence was insufficient to support conviction of greater offense of first degree murder); State v. Long, 45 S.W.3d 611, 622 (Tenn. Crim. App. 2000) (stating that, where evidence is not sufficient to support the greater offense but is sufficient to support the lesser-included offense, an appellate court may order reduction in the degree

---

[16] Like second degree murder, reckless homicide is a result-of-conduct offense. See Ducker, 27 S.W.3d at 896 (recognizing that result-of-conduct offenses focus on whether the accused "possessed the required culpability to effectuate the result" proscribed by the offense).

of the offense for which the defendant could be convicted). Further, the trial court shall sentence Defendant for reckless homicide.

### D. Attempted Rape

Defendant also challenges the sufficiency of the evidence supporting his conviction of attempted rape. As charged in this case, rape is defined as the "unlawful sexual penetration of a victim by the defendant" accomplished by force or coercion. Tenn. Code Ann. § 39-13-503(a)(1) (2003). A criminal attempt to commit an offense is established where the accused acts "with the kind of culpability otherwise required for the offense" and engages in conduct that "constitutes a substantial step toward the commission of the offense." Tenn. Code Ann. § 39-12-101(a)(3) (2003). In this case, Defendant claims that the proof of his identity as the perpetrator of the attack on the victim is not sufficient to support his conviction.

We disagree. Although the victim initially identified another person as resembling her attacker, the circumstantial proof in this case is sufficient to support Defendant's conviction. Mr. Pruitt testified that he took Defendant to Ms. Lackey's residence and that Defendant spent fifteen to twenty minutes inside. Mr. Trentham testified that Ms. Lackey appeared at his apartment naked from the waist down and stated that she had been attacked. Deputy Benton and Ms. Ellison saw Ms. Lackey's pants and underwear next to her bed. Admissible hearsay established that Ms. Lackey's assailant had placed his hand between her legs. DNA evidence established a strong correlation between Defendant and a hat left on Ms. Lackey's bed during the attack. This evidence is sufficient to support Defendant's conviction of attempt to commit rape.

## CONCLUSION

We affirm Defendant's conviction of attempt to commit rape. The record does not contain sufficient evidence to support Defendant's conviction of second degree murder but does contain sufficient evidence to support a conviction of reckless homicide. We therefore reverse and vacate Defendant's conviction of second degree murder and remand this matter to the trial court for (1) the entry of an amended judgment reflecting a conviction of reckless homicide, and (2) a sentencing hearing on the reckless homicide conviction, including a determination of whether Defendant's sentence for reckless homicide should run concurrently or consecutively to his sentence for attempt to commit rape. Defendant is entitled to no relief as to the remaining issues raised. Defendant having been found indigent, the costs of this cause are taxed to the State of Tennessee.

_____
CORNELIA A. CLARK, CHIEF JUSTICE