# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### Assigned on Briefs September 27, 2011

## STATE OF TENNESSEE v. KEVIN FRITZ EDWARDS

**Appeal from the Criminal Court for Unicoi County**
**No. 6071      R. Jerry Beck, Judge**

---

**No. E2010-01731-CCA-R3-CD - Filed May 18, 2012**

---

The Defendant, Kevin Fritz Edwards, was indicted by the Unicoi County Grand Jury of one count of aggravated sexual battery. See Tenn. Code Ann. § 39-13-504(a)(4). Following a jury trial, the Defendant was convicted of the lesser-included offense of attempted aggravated sexual battery. See Tenn. Code Ann. §§ 39-12-101, -13-504(a)(4). In this appeal as of right, the Defendant contends (1) that the evidence was insufficient to sustain his conviction for attempted aggravated sexual battery; (2) that the trial court abused its discretion by excluding evidence of the victim's prior false accusation of sexual battery; (3) that the trial court abused its discretion by excluding evidence of other prior allegations of sexual abuse and sexual abuse counseling pursuant to Tennessee Rule of Evidence 412; (4) that the trial court abused its discretion by not allowing him to impeach the testimony of the victim's mother; and (5) that the trial court erred by denying the Defendant an alternative sentence because it considered a psychosexual evaluation which was based on "unreliable scientific tests." Following our review, we conclude that the evidence was insufficient to sustain the Defendant's conviction for attempted aggravated sexual battery. Accordingly, we reverse and dismiss the judgment of the trial court. We will also address the remainder of the Defendant's arguments so as not to pretermit his remaining issues. See State v. Parris, 236 S.W.3d 173, 189 (Tenn. Crim. App. 2007) (following a similar procedure).

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court is Reversed and Dismissed.**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which ALAN E. GLENN and CAMILLE R. MCMULLEN, JJ., joined.

Jeffery C. Kelly, District Public Defender; William L. Francisco, Assistant Public Defender (at trial); and Steve McEwen, Mountain City, Tennessee (on appeal), for the appellant, Kevin Fritz Edwards.

Robert E. Cooper, Jr., Attorney General and Reporter; Lindsy Paduch Stempel, Assistant Attorney General; Anthony Wade Clark, District Attorney General; and Fred Lance, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

FACTUAL BACKGROUND

The victim, J.S.,[1] testified at trial that she was born in March 1999, and that she was ten years old at the time of the trial. When J.S. was eight years old, she lived with her mother, father, and brother in an apartment complex in Erwin, Tennessee. J.S. was friends with another girl, C.T.,[2] whose mother lived in a different building of the apartment complex. C.T.'s mother was a "live-in caregiver" for the Defendant. C.T.'s mother lived in the Defendant's apartment, and C.T. would stay there as well when her mother had custody of her. J.S. testified that she and C.T. would "[p]lay . . . around the parking lot," that she would "go to [C.T.'s] house and play," and that she had spent the night with C.T. both "at her dad's house" and at the Defendant's apartment.

On February 11, 2008, J.S. went to the Defendant's apartment to spend the night with C.T. J.S. explained that she had not seen C.T. "in a long time and [she] just really wanted to play with her." The Defendant was not at the apartment when J.S. first arrived. J.S. could not recall when the Defendant arrived at the apartment, but testified that the Defendant stayed in his room after he came home. J.S. testified that she and C.T. spent the day "playing and watching movies." After they "watched TV for a while," the girls took baths, played some more, ate dinner, and then went to bed around 9:00 or 10:00 p.m.

When the girls went to bed, they were lying down on blankets and pillows in the living room floor in front of the television. J.S. testified that C.T. laid "right next to [her], but [they] had pillows between each other." J.S. recalled that she wore her underwear and a nightgown she borrowed from C.T.'s mother to bed. According to J.S., the girls watched the movie "Terminator" as they went to bed. J.S. denied being scared by the movie because she had "watched a lot of scary movies at night." J.S. denied that she was scared at all that night and testified that "it was easy for [her] to go to sleep." However, J.S. also testified that she "couldn't sleep" that night because she forgot to take her medication. J.S. explained that she took medication to help her sleep and that without it she would "stay up all night" and "could stay up for, like, a week without sleeping."

---

[1]This court refers to victims of sexual battery by their initials.

[2]Because C.T. is a minor we will refer to her by her initials in order to protect her privacy.

According to J.S., after C.T. and her mother were both asleep, the Defendant came out of his room and "went to the restroom." After the Defendant finished in the restroom, he stood "at the restroom door," asked J.S. if she was okay, and she responded that she was fine. J.S. denied ever telling the Defendant that she was scared. According to J.S., the Defendant then "came down and laid with [her] under the covers." J.S. testified that the Defendant then "started rubbing [her] breast, [her] vagina, and [her] bottom, and [she] didn't feel comfortable at all." J.S. stated that the Defendant started "from [her] neck, then [her] breasts" and "just kept rubbing" her for 10 to 30 minutes. When asked if the Defendant touched her on top of her clothes, J.S. responded that the Defendant touched her "[a] little on top, and the bottom." J.S. testified that the Defendant then got up and "went back to his room."

According to J.S., the Defendant came back out of his room 10 to 20 minutes later, lay down next to her, and began rubbing her again. J.S. testified that the Defendant then "went back to his room, and came out a third time, and started rubbing [her] again." J.S. stated that the Defendant "was on the floor under the covers" and that he rubbed her in "[t]he same places" for 10 to 20 minutes, until she said that she needed to go to the bathroom. J.S. testified that she got up and went through C.T.'s mother's room to get to the bathroom. According to J.S., she "was trying to" wake up C.T.'s mother, but she "kind of got nervous, so [she] just went to the restroom, trying to calm [herself] down." J.S. testified that when she came out of the bathroom, the Defendant "was standing at the door" and he "grabbed [her] hand and laid [her] back down [in the living room] and went back to his room."

J.S. testified that the Defendant then came out and "started rubbing [her] again" for a fourth time. J.S. stated that the Defendant rubbed on her "breast and [her] butt and [her] side." According to J.S., when the Defendant finished, he told her not to tell anyone about what he did and she told him that she would not. J.S. testified that "[s]traight after" the last incident she told C.T. "every single detail that happened." According to J.S., C.T. "said that [she] needed to go to sleep and [they] would tell her mother in the morning." J.S. testified that she went to sleep, and after breakfast the next morning, C.T. told her mother about what had happened. J.S. further testified that she told C.T.'s mother "the same exact thing" she had told C.T. the night before and had testified to in court. J.S. stated that C.T.'s mother talked to the Defendant about what she had told her.

J.S. testified that after she told C.T.'s mother about what the Defendant had done, she and C.T. "started playing and jumping on the couches [] and stuff like that." J.S. explained that she did not go home first thing in the morning because C.T. "wanted [her] to stay for a few more hours because [they had] not seen each other in a while," and they "really wanted to spend time together and play." According to J.S., C.T.'s mother and the Defendant sat on the couch while the girls played that morning. When asked on cross-examination how she

was able to "keep calm playing with [C.T.] all day long," J.S. responded that she and C.T. "tried to get it off [their] minds so [they] could play." J.S. explained that she "was thinking about it the whole time, but [she] wouldn't let it bother [her]" because she "wanted to spend time with [C.T.]." J.S. testified that she probably went home "about lunchtime" or maybe later in the afternoon.

J.S. testified that after lunch she "went straight to tell [her] mom" about what had happened. J.S. stated that she told her mother "the whole story" when she got home. According to J.S., her mother then told her father and called C.T.'s mother. J.S. testified that her mother told C.T.'s mother about her conversation with J.S. Then J.S.'s mother "called the law." J.S. further testified that her parents "were very upset" when she told them what had happened and that she was upset too.

On cross-examination, J.S. admitted that she had played with C.T. at the Defendant's apartment on numerous prior occasions while the Defendant was home. J.S. also testified that she had trusted the Defendant and had "known him to be a really nice guy" prior to this incident. J.S. denied that she had trouble sleeping that night because she was scared to be in the Defendant's apartment. J.S. admitted that she knew that if "something [was] wrong" she should have immediately told an adult. J.S. further admitted on cross-examination that her mother and father had taught her to immediately "report inappropriate touching" prior to that night. Also on cross-examination, J.S. testified that had this happened on a playground she would have "immediately [gone to] tell a teacher." However, J.S. testified that she did not know what was different between that situation and what the Defendant had done or why she did not immediately tell C.T.'s mother about the Defendant's actions.

On cross-examination, J.S. admitted that she had talked about what had happened to her a lot at home since that night. J.S. explained that she had to talk about it a lot at home because she was "trying to remember it really good so" she could tell the jury what happened. J.S. further explained that she had "to practice this over and over in order to remember what happened" because she was "not a really good rememberer [sic]." J.S. testified that she felt she "needed to practice a lot" and explained that she said it "in [her] head a lot of times, so [she could] try to remember." J.S. also admitted on cross-examination that she talked about what had happened with her counselor, whom she had been seeing before this happened.

At trial, the State also presented the testimony of Chief Jimmy Tilson of the Erwin Police Department. Chief Tilson testified that at the time of the offense, he was "the investigator for the Erwin Police Department." Chief Tilson recalled that in February 2008, he was dispatched to the victim's apartment complex to investigate an "alleged sexual assault." Chief Tilson testified that when he arrived at the victim's apartment, there were "a lot of people around." Chief Tilson testified that when he arrived on the scene, it had turned

-4-

into a "[c]ommunity event" with people crowded around the outside of the apartment and in the parking lot. J.S.'s mother answered the door, and Chief Tilson spoke with her first. Chief Tilson recalled that J.S. was 10 to 15 feet away from him as her mother told him what had happened. Chief Tilson described the apartment as being loud and crowded. According to Chief Tilson, "[t]here were several people in [the apartment] . . . [and] [e]verybody was upset over the allegation. There was a lot of loud talking and discussion between adults in the room." Chief Tilson also recalled that there was "[m]ore than the family" inside the apartment.

Chief Tilson testified that J.S.'s mother was upset while she told him what had happened. Chief Tilson recalled that J.S.'s mother began crying and was "cursing" a lot. However, Chief Tilson noted that there was lot of cursing "going on . . . [t]hroughout the house." Chief Tilson also spoke with J.S.'s father and described him as being "[v]ery calm." Chief Tilson then spoke with J.S. Chief Tilson testified that what J.S. told him "was consistent with what [he] was told by the mother when [he] came to the apartment." Chief Tilson recalled that the mother was present when he spoke to J.S. and that she seemed "[p]rotective" of J.S. According to Chief Tilson, C.T.'s mother was "back and forth" between the victim's apartment and the Defendant's apartment while he was interviewing the victim and her family. Chief Tilson testified that C.T.'s mother told him that J.S. had told her that the Defendant "had laid down with her that morning," that she confronted the Defendant about it, and that the Defendant "denied any wrongdoing."

After speaking with C.T.'s mother, Chief Tilson went to the Defendant's apartment to interview him. Chief Tilson explained that the Defendant and the victim lived in separate buildings in the apartment complex that were a "[c]ouple hundred yards" apart. Chief Tilson advised the Defendant of his rights pursuant to Miranda v. Arizona, 384 U.S. 436 (1966), and began to question him. Chief Tilson did not record or write down the Defendant's statement. Chief Tilson testified that the Defendant told him J.S. was in his apartment because she was having a sleep-over with C.T. The Defendant told Chief Tilson that he was "in and out" of the apartment that night and "then eventually came home." The Defendant admitted to having consumed alcohol that night but denied that he was drunk.

The Defendant recalled to Chief Tilson that the girls "were watching TV in the floor in the living room." Chief Tilson testified that the Defendant admitted that "he had laid down with the little girls." Chief Tilson asked the Defendant "why he would lay down with a little girl that . . . he was no kin to." The Defendant explained that J.S. was scared and he was trying "to comfort her." The Defendant denied touching J.S. "at all" and denied that "he had followed her to the restroom." Chief Tilson testified that the Defendant "didn't have an answer" for why he did not wake up C.T.'s mother or get J.S.'s mother from her building when J.S. told him that she was scared. Chief Tilson also testified that the Defendant told

him "that he didn't remember" if he got underneath the covers with J.S. Chief Tilson recalled that his interview with the Defendant was very brief and that it occurred around 8:00 p.m.

C.T.'s mother, T.D.F.,[3] testified for the Defendant at trial. T.D.F. testified that she was "hired as a live-in caregiver" for the Defendant in December 2007. T.D.F. recalled that on February 11, 2008, the Defendant had asked her to purchase some whisky for him. T.D.F. testified that she refused to give the Defendant any liquor "because he was on too many medications and it did make him stupid. It just made him crazy." However, the Defendant "snuck out" and a neighbor took him to buy whisky. T.D.F. testified that she later "found [the Defendant] in the apartment next to [them]." T.D.F. told the neighbor that he would be "responsible" for the Defendant because she did not "need him falling down and stumbling [] around the kids." T.D.F. explained that she did not allow the Defendant to be around her child when he was intoxicated. T.D.F. left the Defendant at their neighbor's apartment.

That same day, J.S. had come over to the Defendant's apartment to spend the night with C.T. T.D.F. testified that J.S. had stayed at the Defendant's apartment "several times[,] . . . [a]lmost every time [C.T.] came [to the Defendant's apartment], [J.S.] was around." According to T.D.F., she went back to the neighbor's apartment around 6:00 p.m. and the Defendant was "falling down" drunk. T.D.F. and the neighbor had to help the Defendant back to his room because the Defendant was too intoxicated to walk. T.D.F. and the neighbor took the Defendant straight to his bed where they laid him down fully clothed. The Defendant did not speak to the girls when he got home. T.D.F. testified that after she put the Defendant to bed, she did not see him for the rest of the night. T.D.F. also testified that it was rare for the Defendant to be so intoxicated. T.D.F. recalled that she "stacked blankets and pillows" in the living room floor in front of the television for the girls to sleep on. T.D.F. testified that she "checked on" the girls throughout the night, brought them snacks, and could hear "them giggling all night." The girls watched episodes of the children's horror show "Goosebumps" throughout the night. T.D.F. testified that when she went to bed around 1:30 or 2:00 a.m., the television was still on and the girls were "sound asleep."

T.D.F. testified that she woke up the next morning between 7:00 and 7:30 a.m. when she heard the girls "giggling." According to T.D.F., she then went to the living room to ask the girls what they wanted for breakfast. T.D.F. testified that when she entered the room, her daughter "sat straight up" and said, "Mommy, [the Defendant] laid by [J.S.]." T.D.F. asked her daughter if the Defendant touched J.S., and her daughter said that she did not "think so." T.D.F. testified that she "wigged out at first," because "[a]ny time that . . . a woman hears

---

[3]In order to protect C.T.'s privacy we will refer to her mother by her initials.

that a man lays down beside a little girl, anybody in their right mind is going to find out what the heck happened."

T.D.F. recalled that she immediately went to the Defendant's bedroom where she found him watching television. T.D.F. testified that she asked the Defendant about what happened, and she then "brought him into the livingroom" with J.S. and talked to both of them. According to T.D.F., both the Defendant and J.S. "said the same thing." T.D.F. testified that both told her that J.S. "said that she was scared," and the Defendant "laid down" and told her that it was okay and that "[n]othing's going to get you." T.D.F. also testified that she asked J.S. if the Defendant "had touched her in any inappropriate way" and that J.S. told her no. T.D.F. told the jury that at no point during the morning did J.S. "accuse[] [the Defendant] of molesting her." T.D.F. also testified that the Defendant was sober when she questioned him that morning.

T.D.F. testified that after J.S. told her that the Defendant did not touch her, she "didn't mess with it anymore." T.D.F. recalled that J.S. stayed to eat breakfast and played. T.D.F. testified that "everything was fine as far as [she] knew" and that "[n]obody said another word about it." According to T.D.F., J.S. stayed "[s]everal hours" and did not go home until "well after lunch." T.D.F. testified that the girls did not seem scared or upset but instead seemed happy and "were playing." About "three or four hours" after J.S. went home, T.D.F. received a phone call from J.S.'s mother. T.D.F. testified that she went to J.S.'s apartment because she "didn't know what was going on." When she got to the apartment, she saw J.S. crying and "found out . . . that [the Defendant] was being accused." T.D.F. noted that J.S.'s parents had been home the night before and all day that day.

T.D.F. told the jury that she was "comfortable" with the Defendant being around her daughter. T.D.F. also stated that if she thought the Defendant had touched J.S., she would have called the police "[i]n a heartbeat" and "probably would have beat the hell out of" the Defendant. T.D.F. testified that the Defendant was "crippled all up," that "on his bad days" he had trouble moving and getting out of bed, and on rare occasions, that the Defendant could not get out of bed at all. T.D.F. further explained that the Defendant was able to move "slowly" when he was drunk and that when she questioned him that morning, he "was walking very slow." On cross-examination, T.D.F. did admit that she "had about four beers" as she watched the girls on February 11, 2008. T.D.F. testified that she had her last beer around 9:00 p.m. and denied that she was intoxicated. T.D.F. further testified that she was sober when she questioned the Defendant and J.S. the next morning.

Defense counsel also called the victim's mother, S.S.,[4] as part of the Defendant's case-in-chief. S.S. testified that on February 12, 2008, her daughter returned "kind of in the evening" but before dark. According to S.S., J.S.'s father and brother were "in bed" when she got home. S.S. stated that her daughter "wasn't very happy" when she got home and that she told her "that she needed to sit down and talk." S.S. testified that J.S. said "the Defendant had touched her in her privates." After J.S. told her this, S.S. called T.D.F. "first and told her she needed to get her butt up to the apartment." Then S.S. "called the cops, and [she] woke [her] husband up." S.S. estimated that the police arrived around 8:00 p.m. S.S. testified that J.S. was standing "next to" her as she told the police that "the Defendant had touched [J.S.] inappropriately." S.S. denied that there was anyone in her apartment besides her family and the police. At the close of defense counsel's direct examination, he asked S.S. if she had "ever lied in court." The State objected and the trial court sustained the objection. The trial court stated that "[y]ou generally can't call a witness just to impeach a witness."

The Defendant denied that he inappropriately touched J.S. and testified that he had never "been accused of something like this before." The Defendant told the jury that the events J.S. had testified about "didn't happen." The Defendant testified that on February 11, 2008, he consumed about "half a pint" of "liquor" at his neighbor's apartment. The Defendant explained that T.D.F. "wouldn't buy [him] liquor" so he "went out and got liquor and [came] back" to his neighbor's apartment. The Defendant admitted that he would sometimes "get so drunk [he would] fall down." The Defendant testified that he could not remember coming back to his apartment, if he needed help getting back to his apartment, what time he came back to his apartment, or how drunk he was that day.

The Defendant testified that he "[w]oke up sober sometime during the night." The Defendant could not remember what time it was when he woke up. The Defendant testified that he got up "to get a piece of bread or something to drink, [be]cause [he] usually [did] that." According to the Defendant, he had to go by the living room to get to the kitchen. The Defendant testified that as he made his way to the kitchen, J.S. came to him and told him that "she was scared." The Defendant told the jury that he "patted her on the head" and told her that there was nothing to be afraid of. The Defendant testified that he explained to J.S. that T.D.F. was there and that the front door was locked.

According to the Defendant, he then told J.S. that he would "lay down with [her] and watch the TV." The Defendant explained that he "used to do [that] with [his] daughter, . . . lay down in the floor and watch TV right there." The Defendant denied that he got underneath the covers with J.S. The Defendant explained that "the covers wasn't over to [him]" because he "was laying up against the couch" about "two feet" away from the girls.

---

[4]In order to protect the privacy of the victim we will refer to her mother by the mother's initials.

The Defendant estimated that he was in the floor for only 10 or 12 minutes because he could not lie on the floor long due to his "back and bones and stuff." The Defendant recalled that C.T. was also awake and that she asked what they were "watching on cartoons." The Defendant testified that after a few minutes he got up and went back to bed. According to the Defendant, he "didn't get back up" the rest of the night. The Defendant denied that he touched J.S. while they were in the floor, that he came out of his room three more times and touched her, and that he followed her to the bathroom. The Defendant testified that he did not know if T.D.F. was awake when this happened and that he could not remember what the victim was wearing that night.

The Defendant testified that the next morning T.D.F. "asked [him] about . . . the deal and laying [sic] down there." According to the Defendant, he "sat down" with T.D.F. and the girls to talk about what happened. T.D.F. wanted to know "how come [he had] laid [sic] down there" and he told her "that's what [he] used to do with [his] daughter, to lay [sic] and watch cartoons." The Defendant testified that no one said anything about him having touched J.S. and that T.D.F.'s "little girl said there was no problem. And [J.S.] said there was no problem."

Based upon the foregoing evidence, the jury acquitted the Defendant of the charged offense of aggravated sexual battery. Instead, the jury convicted the Defendant of the lesser-included offense of attempted aggravated sexual battery. Following a sentencing hearing,[5] the trial court sentenced the Defendant to three years imprisonment as a Range I, standard offender.

## ANALYSIS

### I. Sufficiency of the Evidence

The Defendant contends that the evidence was insufficient to sustain his conviction for attempted aggravated sexual battery. The Defendant argues that the evidence presented at trial provided for only two possible scenarios, either the Defendant touched the victim or he did not. The Defendant further argues that the State's case "hinged entirely upon the testimony" of J.S. and that she "expressly testified" that the Defendant completed the offense, "and not merely that he attempted to have sexual contact." The Defendant reasons that because the jury acquitted him of the charged offense of aggravated sexual battery, the jury must have rejected J.S.'s testimony that the offense was completed. Therefore, the

---

[5]Because we have concluded that the evidence was insufficient to sustain the Defendant's conviction, we will discuss the factual background of the Defendant's remaining procedural issues, including those relating to the sentencing hearing, in other portions of this opinion.

Defendant concludes that there was no evidence to support his conviction for attempted aggravated sexual battery. The State responds that the evidence was sufficient to sustain the Defendant's conviction because J.S. testified that he completed the charged offense. The State further responds that the jury, "by its verdict, obviously accredited the victim's testimony."

An appellate court's standard of review when the defendant questions the sufficiency of the evidence on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). This court does not reweigh the evidence; rather, it presumes that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the State. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions regarding witness credibility, conflicts in testimony, and the weight and value to be given to evidence were resolved by the jury. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). A guilty verdict "removes the presumption of innocence and replaces it with a presumption of guilt, and [on appeal] the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict." Id.; State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). "This [standard] applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of [both] direct and circumstantial evidence." State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999).

As applicable to this case, aggravated sexual battery is statutorily defined as "unlawful sexual contact with a victim by the defendant" where the victim is less than 13 years old. Tenn. Code Ann. § 39-13-504(a)(4). Sexual contact "includes the intentional touching of the victim's . . . intimate parts, or the intentional touching of the clothing covering the immediate area of the victim's . . . intimate parts, if that intentional touching can be reasonably construed as being for the purpose of sexual arousal or gratification." Tenn. Code Ann. § 39-13-501(6). Criminal attempt is committed when a person "acting with the kind of culpability otherwise required for the offense," acts "with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense." Tenn. Code Ann. § 39-12-101(a)(3). Conduct does not constitute a substantial step "unless the person's entire course of action is corroborative of the intent to commit the offense." Tenn. Code Ann. § 39-12-101(b). Thus, the State had to prove that the Defendant had the specific intent to commit aggravated sexual battery and that he took a substantial step toward the completion of the offense, as corroborated by his entire course of action.

The Defendant was indicted and tried on a charge of aggravated sexual battery. J.S.'s testimony was unequivocal that the Defendant repeatedly touched her breasts, vagina, and buttocks. The jury could have chosen to accredit J.S.'s testimony over that of T.D.F. and the Defendant. Had the jury done this, the evidence would have been sufficient to sustain a conviction for aggravated sexual battery. However, the jury acquitted the Defendant of the aggravated sexual battery charge and instead convicted him of the lesser-included offense of attempted aggravated sexual battery. While attempt was a lesser-included offense, a trial judge "shall not instruct the jury as to any lesser included offense unless the judge determines that the record contains any evidence which reasonable minds could accept as to the lesser included offense . . . . [and] whether the evidence . . . is legally sufficient to support a conviction for the lesser included offense." Tenn. Code Ann. § 40-18-110(a) (emphasis added); see also State v. Burns, 6 S.W.3d 453, 467-69 (Tenn. 1999) (holding that the "mere existence of lesser offense to a charged offense is not sufficient alone to warrant a [jury] charge on that offense" and laying out the same two-step analysis to determine whether a jury charge is justified by the evidence).

After addressing several cases where defendants have complained about a lack of an attempt instruction, our courts have established that an "attempt instruction is not required if the only proof presented was proof of the completed crime as opposed to an attempt." State v. Biggs, 218 S.W.3d 643, 658 (Tenn. Crim. App. 2006) (citing State v. Marcum, 109 S.W.3d 300, 304 (Tenn. 2003)). For example, in Marcum, our supreme court concluded that "no instruction on attempt was warranted" because the testimony at trial "was susceptible of only two interpretations-that [a] rape occurred or that it did not." 109 S.W.3d at 304. In that case, the victim testified that the defendant forced her to perform fellatio, and the defendant "testified that this event never happened and, further, that he was never left alone with the victim at all." Id. Likewise, this court in a case involving a conviction for aggravated sexual battery where the testimony of the victim and the defendant was "unequivocal with regard to whether or not the touching occurred," has reasoned that, based on those facts, there was no proof in the record "that could lead to even an inference" that the defendant committed attempt; therefore, "no reasonable mind could accept as to the lesser-included offense of attempted aggravated sexual battery . . . ." State v. Randall Vertis Grainger, No. M2001-02178-CCA-R3-CD, 2002 WL 31385936, at *5 (Tenn. Crim. App. Oct. 22, 2002), perm. app. denied, (Tenn. Mar. 3, 2003); see also State v. Joseph Hall, No. E2006-02403-CCA-R3-CD, 2007 WL 2917784, at *5 (Tenn. Crim. App. Oct. 9, 2007), perm. app. denied, (Tenn. Mar. 10, 2008) (concluding the same where the victims testified that the defendant "did in fact touch" their buttocks and penis and the defendant's "only claim was that he did not commit the offenses, not that he tried to and failed"); Jerome Sawyer v. State, No. W2005-01813-CCA-R3-PC, 2007 WL 778828, at *20 (Tenn. Crim. App. Mar. 15, 2007), perm. app. denied, (Tenn. Aug. 13, 2007) (concluding the same where the victim testified that the

petitioner "pulled down her pants and touched her in her genital area" and the petitioner's defense "was that the touching never occurred").

Like the previously cited cases, there was no evidence presented at trial that the Defendant attempted to touch the victim and failed. J.S. was unequivocal in her testimony that the Defendant got underneath the covers with her and touched her breasts, vagina, and buttocks on four different occasions that night. The Defendant was likewise unequivocal that he did not inappropriately touch J.S. and that he merely lay down by the couch and never got underneath the covers. The evidence at trial presented only two possible interpretations of the facts – that the defendant either completed the offense of aggravated sexual battery or he did not. As such, the trial court should not have instructed the jury on the lesser-included offense of attempted aggravated sexual battery. The evidence did not justify a jury charge on attempt because there was no evidence which reasonable minds could have accepted as to the lesser-included offense.

Under Tennessee law, it was previously thought that a defendant "would not be heard to complain" when convicted of a lesser-included offense that was erroneously charged and not supported by the proof, as long as the proof was sufficient to support the greater (and correctly charged) offense. See State v. Mellons, 557 S.W.2d 497, 499 (Tenn. 1977), overruled by State v. Parker, 350 S.W.3d 883 (Tenn. 2011). The reasoning behind this notion was that a jury's verdict convicting a defendant of an improperly charged lesser-included offense when the evidence would have supported a conviction for the greater charged offense "could best be understood as an act of mercy" which a defendant could not challenge on appeal. Id. However, our supreme court has recently rejected this notion in State v. Parker, 350 S.W.3d at 883. In Parker, the supreme court observed that the power of the jury "to err upon the side of mercy . . . has never been thought to include a power to enter an unreasonable verdict of guilty." Id. at 907 (quoting Jackson v. Virginia, 443 U.S. 307, 317 n.10 (1979)) (ellipsis in original). Accordingly, the court held as follows:

> [A] defendant may challenge the sufficiency of the evidence where he or she is convicted of a lesser-included offense charged to the jury, whether or not the proof is sufficient to support the primary offense. To sustain a conviction of a lesser-included offense, the proof must be sufficient to support each and every element of the conviction offense.

Id. at 909. "If the proof does not adequately support each and every element, the defendant is entitled to a reversal of the conviction." Id.

This case differs somewhat from Parker in that the lesser-included offense at issue here is attempt. The defendant in Parker was indicted for first degree felony murder but

convicted of the improperly charged lesser-included offense of second degree murder. 350 S.W.3d at 895. Our supreme court concluded that there was "simply not enough proof in the record to establish that [the defendant] acted 'knowingly' with respect to causing a fatal injury to the victim." Id. at 904. While the evidence would have been sufficient to sustain a conviction of the charged offense of first degree felony murder, the supreme court reversed the defendant's conviction for second degree murder because the evidence was insufficient to establish the mens rea element. Id. at 909-10. Part of the court's reasoning relied on the fact that had the defendant "been indicted for, and convicted of, second degree murder, his conviction would be reversed for insufficient evidence." Id. at 909. While the jury charge decisions discussed above make it clear that attempt should not have been charged in this case because there was no evidence the Defendant tried and failed to complete the crime, the attempt statute provides that "[i]t is no defense to prosecution for criminal attempt that the offense attempted was actually committed." Tenn. Code Ann. § 39-12-101(c). However, we do not believe that this establishes that the evidence was sufficient to sustain the Defendant's conviction for attempted aggravated sexual battery in this case.

First, we note that the Defendant was prosecuted for the completed offense of aggravated sexual battery and not attempt, which was an improperly charged lesser-included offense. Second, as is clear from the wording of the statute and further clarified by the Sentencing Commission Comments, subsection (c) "eliminates the defense that the offense has in fact been committed."[6] However, the only defense presented at trial was that no crime ever occurred. Finally, and most importantly, the jury acquitted the Defendant of the charged crime of aggravated sexual battery. As we have previously stated, the evidence presented at trial led to only two possible factual scenarios – that the Defendant either completed the offense or he did not. Therefore, we agree with the Defendant that by acquitting him of the aggravated sexual battery charge the jury rejected J.S.'s testimony that the Defendant repeatedly touched her breasts, buttocks, and vagina.

Even viewing the remaining evidence in the light most favorable to the State and assuming that the jury accepted J.S.'s testimony that the Defendant repeatedly lay underneath the covers with her, we cannot conclude that the evidence was sufficient to establish attempted aggravated sexual battery. To establish that the Defendant's conduct constituted a substantial step the State had to show that the Defendant's "entire course of action [was]

---

[6]Prior to the enactment of Tennessee Code Annotated section 39-12-101, a conviction for attempt required a showing of "failure to consummate the crime" in addition to the other two required elements. State v. Michael K. Christian, Jr., No.03C01-9609-CR-00336, 1998 WL 125562, at *7 n.2 (Tenn. Crim. App. Mar. 23, 1998), perm. app. denied, (Tenn. Jan. 19, 1999). As relevant here, the State did not have to prove that the crime was incomplete, only that the Defendant had the specific intent to commit aggravated sexual battery and that he took a substantial step toward the completion of the offense.

-13-

corroborative of [his] intent to" intentionally touch the victim's intimate parts or the clothing immediately covering her intimate parts for the purpose of sexual arousal or gratification. Tenn. Code Ann. § 39-12-101(b). We cannot conclude that lying underneath the covers with the victim alone would constitute a substantial step towards committing aggravated sexual battery. Our previous cases dealing with attempted aggravated sexual battery have involved defendants touching other areas of the victims' bodies or removing articles of the victims' clothing. See State v. Taylor, 63 S.W.3d 400, 406 (Tenn. Crim. App. 2001) (defendant "rubbed the victim's belly, held the victim down, and talked dirty to the victim"); State v. Joshua Parker, No. E2004-02374-CCA-R3-CD, 2006 WL 36910, at *5 (Tenn. Crim. App. Jan. 6, 2006) (defendant held the victim down and touched her "close to her private part" while attempting to undo and reach down her pants); State v. Delbert G. Mosher, No. 01C01-9807-CC-00320, 1999 WL 820871, at *2 (Tenn. Crim. App. Oct. 13, 1999) (defendant licked the inside of the victim's knee); State v. Timothy D. Lundeen, No. 03C01-9602-CC-00079, 1997 WL 167222, at *2 (Tenn. Crim. App. Apr. 10, 1997) (defendant found in victim's room with the victim lying on her bed with her genitals exposed and the defendant leaning over her with "his genital area practically touching hers"); State v. Jerry D. Reece, No. 01C01-9601-CC-00021, 1996 WL 529995, at *2 (Tenn. Crim. App. Sept. 19, 1996), perm. app. denied, (Tenn. Mar. 3, 1997) (defendant attempted to reach down one victim's nightshirt, attempted to pull up the shirt of another victim, licked the arm of one victim and then leaned over a victim's lap and wagged "his tongue back and forth like a dog"). Because the jury rejected J.S.'s testimony that the Defendant actually touched her "intimate parts," we conclude that there was no remaining evidence in the record that proved the Defendant had the intent to commit aggravated sexual battery and that he took a substantial step toward the completion of that offense. Accordingly, the judgment of the trial court is reversed and dismissed.

## II. The Defendant's Remaining Issues

### A. Victim's False and Prior Allegations of Sexual Abuse

The Defendant contends that the trial court erred by excluding evidence that J.S. had made a prior false accusation of sexual battery as well as evidence of several prior allegations of sexual abuse regarding J.S. The Defendant argues that evidence of a false accusation of sexual battery by J.S. against her brother in 2007 was not barred by Tennessee Rule of Evidence 412[7] and was admissible to impeach J.S.'s credibility as a witness. The Defendant also argues that evidence of several prior allegations of sexual abuse regarding J.S., as well as evidence that J.S. underwent counseling due to those allegations, was admissible pursuant

---

[7]Rule 412 replaced Tennessee's rape-shield statute and prevents, with certain enumerated exceptions, the admission of evidence of a victim's past sexual behavior in trials for certain specified sex crimes. Advisory Comm'n Cmts.

-14-

to Rule 412 "to prove or explain" J.S.'s "knowledge of sexual matters." The State responds that this evidence "had no probative value" and that J.S.'s testimony "did not demonstrate an extraordinary knowledge of sexual behavior or vocabulary that would be unusual for a ten-year-old child."

Prior to trial, and pursuant to the procedures required in Rule 412(d), the Defendant filed a motion along with a written offer of proof requesting the trial court to "allow [] testimony of the alleged victim's prior sexual behavior to prove or explain the alleged victim's knowledge of sexual matters." The written offer of proof, citing a record from the Tennessee Department of Children's Services (DCS) previously filed under seal with the trial court, outlined several allegations that J.S.'s paternal grandfather and brother had sexually abused her in the past.

The DCS record revealed that less than a year before the alleged incident occurred in this case, J.S.'s mother, prior to a scheduled parent-teacher conference at the children's school, "blurted out [an] allegation" that J.S.'s brother "had molested [J.S.]." Several people were present in the room including both J.S. and her brother. J.S.'s mother told school officials that the brother had touched J.S.'s vaginal area and put his head between J.S.'s legs "and under her underwear." School officials interviewed J.S. privately, and when asked if her brother "had done anything to her," she shook her head yes. When asked what happened, J.S. "pointed to her knees, up to her crotch" and said that her brother "went under her underwear." J.S.'s mother "made it very clear" that she wanted J.S.'s brother "locked up."

J.S.'s mother, S.S., was interviewed by a DCS case manager the next day. S.S. stated that she "was not present in the room when [the incident] occurred but was informed directly afterward" by J.S. S.S. informed the case manager that she had reported the incident to her son's therapist. S.S. claimed that the therapist told her that her children were to "never be alone again" and that she needed to inform her son's school so they could "take extra precautions." When school officials learned that the therapist had not reported the incident to DCS, they contacted DCS and J.S.'s brother was taken into custody. S.S. also told the case manager that this incident was the third or fourth time J.S.'s brother "had done something like this" and claimed that her son did "not tell the truth."

J.S.'s brother was placed into juvenile detention and "charged as a result of his sister's and mother's statements." When interviewed privately by a DCS case manager, J.S.'s brother stated that he and J.S. were playing and she "was stepping on his toy" and would not give it back to him. That made J.S.'s brother mad, so he "butted his head into her knee area." J.S.'s brother admitted that "he butted her more than once and may have hit her in the crotch area." Both children were clothed when this happened, and J.S.'s brother stated that he only "butted" her with his head because "he wanted her off his toy before she broke it." J.S.'s

brother denied ever touching her "in her private area." J.S. was also interviewed privately by the case manager. J.S. stated that "she was standing on her brother's toy, he asked her to move and she didn't, [so] he knocked her with his head to push her off balance." J.S. told the case manager that she was fully clothed when this happened, and she denied that her brother had "ever touched her in her private places."

The DCS case manager also interviewed J.S.'s father who thought that the incident had "been overblown and that [J.S.'s brother] just wanted his sister to move away." The case manager also spoke with the therapist who was surprised that J.S.'s brother was taken into custody because "she did not think the incident was a big deal." The therapist stated that she talked to both children after the incident happened and that J.S. told her that she was fully dressed when the incident occurred. S.S. was interviewed a second time, and she denied that she "coached" J.S. into making the allegation against her brother. S.S. admitted that she may have viewed some of J.S.'s brother's "inappropriate behaviors as [sexual] abuse [because] of her own personal issues." The case was closed and classified as "unsubstantiated" because "[n]o evidence [was] found to support the allegations." The case manager noted that in her interview with J.S., she denied "any inappropriate behavior initiated by her brother." In private interviews conducted by DCS with both children, they "describe[d] an event that [was] inconsistent with [their] mother's perception of what occurred."

In addition to this incident, the DCS record also revealed that S.S. had made several reports of sexual abuse involving her children while they lived in California. On at least two prior occasions in California, S.S. reported that J.S.'s brother had either inappropriately touched J.S. or exposed himself to her. S.S. also reported that when J.S. was two, she was sexually molested by her paternal grandfather. S.S. had also reported on several occasions that she believed her son had been sexually molested by the same grandfather. California Child Protective Services were unable to determine whether these incidents actually occurred. S.S. had also stated in the record that both children were in counseling because of the sexual abuse allegations.

Pursuant to Rule 412(d), the trial court held a hearing on this matter. At the hearing, S.S. testified that J.S. began counseling when she was three or four years old "because of things that happened with her brother and with her grandfather." S.S. stated that she thought J.S. had overheard her talking with police about the allegations that J.S.'s grandfather had sexually molested J.S. and her brother. S.S. also testified that she believed J.S. was molested by her paternal grandfather when J.S. was two years old. According to S.S., J.S. had told her at different times "through her life" that her grandfather molested her. S.S. also testified that J.S. had also accused her brother of inappropriately touching her. S.S. testified that she taught J.S. to come to her parents or "to scream" if anyone ever tried to touch "her private area." S.S. also testified that J.S. had been told to do the same thing by her counselor. S.S.

explained that J.S. has been told this since she was at least five years old and that J.S. "has [always] immediately responded" to her. S.S. also testified that she had taught J.S. to immediately "go to an adult that she feels that she can trust" if someone tried to touch her and her parents were not around.

J.S. testified that she was first taught about "good touches and bad touches" by her parents when she was in kindergarten. When asked if she remembered telling her parents "about anyone giving [her] a bad touch," J.S. responded that she remembered "telling [her] parents about [the Defendant] and her [grandfather]." When asked how old she was when she told her parents about her grandfather, J.S. responded that she "was too young" and that she "didn't tell [her] mom, but she saw." J.S. further explained that her mother "sometimes" tells her "what she saw." J.S. and her mother were not asked at the hearing about the allegation against J.S.'s brother made at the parent-teacher conference.

The trial court ruled that it would "not allow testimony about specific instances of conduct alleged to have occurred unrelated to the case against [the Defendant]." The trial court concluded that Rule 412 applied to all of the reported allegations of sexual abuse because it did not "see any" instances "where there was any finding of a nonfounded [sic] allegation." In applying Rule 412, the trial court determined that the evidence would not be admissible to explain the victim's "knowledge of sexual matters," reasoning that the victim did not show sexual knowledge beyond a normal ten-year-old. The trial court stated that it was "sure children [the victim's age] discuss[ed] sex." The trial court stated that the purpose of Rule 412 was to prevent a reputation or opinion attack on the victim's credibility, and that allowing the Defendant to question J.S. about these prior allegations would permit just such an attack. The trial court compared the Defendant's request to allowing, in a trial based upon an adult victim's allegation of rape, "[a]ll the boys that played basketball at the local high school" to testify "[s]lutty-slut . . . . I had a sexual affair with her." In concluding the hearing, the trial court warned the State about calling S.S. as a witness. The trial court stated that she could "open the door up real quick" for the evidence it had just ruled as inadmissible. The trial court also told the State that "when you put your witnesses on, always keep in mind you're treading a treacherous trail."

### 1. Evidence of a False Allegation

The admissibility, relevancy, and competency of evidence are matters entrusted to the sound discretion of the trial court and that we review for abuse of discretion. State v. Gray, 960 S.W.2d 598, 606 (Tenn. Crim. App. 1997). Generally, evidence of specific instances of an aggravated sexual battery victim's sexual behavior is inadmissible. Tenn. R. Evid. 412. Sexual behavior is broadly defined as "sexual activity of the alleged victim other than the sexual act at issue in the case." Tenn. R. Evid. 412(a). However, a victim's prior false

allegation of sexual battery does not "constitute 'sexual behavior' as contemplated under Rule 412." State v. Wyrick, 62 S.W.3d 751, 771 (Tenn. Crim. App. 2001). Therefore, Rule 412 does not bar admission of evidence of a victim's prior false allegation of sexual battery. Id. Instead, prior false reports of crime, including sex crimes, "are relevant to a witness's credibility." Id. at 780 (also stating that "with regard to sexual offense, the fact that a victim previously accused another of raping her is material to her charge of rape against the defendant if proof exists that the victim falsified the prior accusation").

Specific instances of conduct may be inquired into on cross-examination if it is probative of the witness's character for truthfulness or untruthfulness. Tenn. R. Evid. 608(b). Upon request, the trial court must hold a jury-out hearing to "determine that the alleged conduct has probative value and that a reasonable factual basis exists for the inquiry." Tenn. R. Evid. 608(b)(1). In this case, the DCS report provided ample factual basis to allow the Defendant to inquire about the false report during his cross-examination of J.S. However, extrinsic evidence is inadmissible to prove a witness's specific instances of conduct to attack the witness's character for truthfulness. Tenn. R. Evid. 608(b); see also Wyrick, 62 S.W.3d at 780 (stating that if "the witness denies the conduct, the party proffering the evidence must be satisfied with that response and may not seek to prove the conduct by extrinsic evidence"). As such, the DCS report and any testimony from S.S. on the matter would have been inadmissible at trial.

In addition to the other requirements listed above, Rule 608 also provides that evidence of specific incidents of conduct which occurred when the witness was a juvenile is generally inadmissible. Tenn. R. Evid. 608(c). However, such evidence is admissible if the witness is not the accused in a criminal case and "if the conduct would be admissible to attack the credibility of an adult and the court is satisfied that admission [of the] evidence is necessary for a fair determination in a . . . criminal proceeding." Id. J.S.'s prior conduct was directly probative of her truthfulness and would have been admissible to attack the credibility of an adult. The only evidence linking the Defendant to the crime was J.S.'s testimony. Therefore, "the admissibility of the prior false accusation was necessary for a fair determination of the case even if the victim was [a juvenile] at the time she made the accusation." Wyrick, 62 S.W.3d at 782. Accordingly, we conclude that the trial court abused its discretion by not allowing the Defendant to cross-examine J.S. about the prior false allegation of sexual battery.

*2. Evidence of Other Allegations of Sexual Abuse*

As stated above, evidence of specific instances of an aggravated sexual battery victim's "sexual behavior" is generally inadmissible unless it falls into one of several certain narrow exceptions. Tenn. R. Evid. 412. One of these exceptions is that evidence of a

victim's sexual behavior "with persons other than the accused" is admissible "to prove or explain . . . knowledge of sexual matters." Tenn. R. Evid. 412(c)(4)(ii). This provision "will most frequently be used in cases where the victim is a young child who testifies in detail about sexual activity." Tenn. R. Evid. 412, Advisory Comm'n Cmts. The Advisory Commission Comments explain that to "disprove any suggestion that the child acquired the detailed information about sexual matters from the encounter with the accused, the defense may want to prove that the child learned the terminology as the result of sexual activity with third parties." Id. Rule 412 broadly defines sexual behavior as "sexual activity of the alleged victim other than the sexual act at issue in the case." Tenn. R. Evid. 412(a). This definition "deals with sexual intercourse as well as every other variety of sexual expression." Wyrick, 62 S.W.3d at 771 (quoting State v. Sheline, 955 S.W.2d 42, 47 n. 6 (Tenn. 1997)). As such, "a conversation about sex is 'sexual behavior' and falls under Rule 412." State v. Michael Lee Davenport, No. M2006-01693-CCA-R3-CD, 2008 WL 2368931, at *10 (Tenn. Crim. App. June 10, 2008).

Before evidence of specific instances of a victim's sexual behavior may be admitted at trial, certain procedural requirements must be met. The defendant must file a written motion ten days prior to trial, accompanied by an offer of proof describing the specific evidence and the purpose for introducing it. Tenn. R. Evid. 412(d)(1). After notice has been given, the trial court must conduct a jury-out hearing to determine whether the evidence is admissible. Tenn. R. Evid. 412(d)(2). Here, the Defendant properly followed the procedural requirements of Rule 412. If a defendant wishes to introduce the evidence for purposes of exhibiting the victim's knowledge of sexual matters, as the Defendant did here, the trial court must decide (1) whether the evidence is relevant to the issue of knowledge of sexual matters and (2) whether the probative value of the evidence outweighs the risk of unfair prejudice to the victim. Tenn. R. Evid. 412(d)(4). "[T]he evidence shall be admissible in the proceeding to the extent an order made by the court specifies the evidence which may be offered and areas with respect to which the alleged victim may be examined or cross-examined." Id.

Rule 412 is "a rule of relevance and is written as a rule of exclusion" with its purpose being "to exclude all evidence regarding the [victim's] prior sexual behavior unless the procedural protocol is followed and the evidence conforms to the specifications of the Rule." State v. Brown, 29 S.W.3d 427, 430 (Tenn. 2000). Rule 412 was enacted

> to reflect the general view that evidence of prior sexual behavior is irrelevant or, if relevant, has little probative value compared to its prejudicial effect, unless the evidence is within one of the enumerated exceptions. When evidence does fall within one of the enumerated exceptions, it is generally viewed as probative of a material issue without being overly prejudicial.

-19-

Id. Rule 412 "strikes a balance between the paramount interests of the accused in a fair trial and the important interests of the sexual assault victim in avoiding an unnecessary, degrading, and embarrassing invasion of sexual privacy." Tenn. R. Evid. 412, Advisory Comm'n Cmts. Rule 412 also recognizes that "despite the embarrassing nature of the proof, sometimes the accused can only have a fair trial if permitted to introduce evidence of the alleged victim's sexual history." Id.

We begin by noting that the trial court in its analysis of this issue spent a significant amount of time addressing reputation or opinion evidence regarding the sexual behavior of an alleged victim. However, reputation or opinion evidence was not at issue in the Defendant's motion and is addressed by a separate subsection of Rule 412. Therefore, the rules for admission of reputation evidence should not have been applied to the Defendant's request to admit evidence of specific instances of the victim's sexual behavior to prove or explain the victim's knowledge of sexual matters. Additionally, we disagree with the trial court's assertion that J.S.'s detailed testimony about the Defendant repeatedly "rubbing [her] breast, [her] vagina, and [her] bottom" exemplified the type of sexual knowledge an eight-year-old or a ten-year-old child normally would possess. Given J.S.'s age at the time of the offense and trial, it would have been reasonable for the jury to assume that she lacked knowledge about sexual matters beyond her alleged "encounter with the accused." J.S.'s credibility was the key issue at trial, and such an assumption would have improperly bolstered her credibility with the jury. At the Rule 412 hearing, the Defendant established that there were repeated allegations that J.S. had been sexually assaulted in the past and that J.S. had numerous conversations about these allegations with her mother and her counselor. Accordingly, we conclude that the trial court abused its discretion by ruling that Rule 412 barred admission of all evidence regarding the victim's prior knowledge of sexual matters.

However, the fact that the trial court erred does not mean that all of the evidence introduced at the Rule 412 hearing or in the DCS report would have been admissible at trial. Instead, the trial court should have limited the Defendant's questioning of the victim to only asking J.S. if she had ever previously reported sexual abuse and if she had ever had conversations about sexual abuse or sex with her mother or her counselor. Permitting the Defendant to ask these limited questions of J.S. on cross-examination and not allowing the Defendant to ask about the details discussed in the DCS report and at the Rule 412 hearing would enable "the jury to gain an effective understanding of the victim's knowledge of sexual matters . . . without denying the [D]efendant his right to a fair trial or unduly degrading or embarrassing the victim." State v. Mario Pisani, No. M2006-00550-CCA-R3-CD, 2007 WL 749642, at *4 (Tenn. Crim. App. Mar. 8, 2007), perm. app. denied, (Tenn. June 18, 2007); see also State v. Hershell W. Estes, Jr., No. E2000-01869-CCA-R3-CD, 2002 WL 170737, at *2-4 (Tenn. Crim. App. Feb. 4, 2002), perm. app. denied, (Tenn. July 1,

2002); State v. Steven Otis Nicely, No. 03C01-9805-CR-00174, 1999 WL 826029, at *6-7 (Tenn. Crim. App. Oct. 18, 1999).

*B. Impeachment of S.S.*

The Defendant contends that the trial court erred by not allowing him to impeach the testimony of the victim's mother, S.S., by asking her whether she had previously lied "in court." The Defendant argues that Tennessee Rule of Evidence 607 allows the party calling a witness to impeach that witness as long as the witness was not called for the sole purpose of impeachment by an inconsistent statement or as a pretext for putting "inadmissible hearsay before the jury." The Defendant argues that he attempted to impeach S.S. by asking her about specific instances of her conduct to attack her character for truthfulness. The State responds that a party may not call a witness solely to impeach that witness.

After the trial court's admonition at the Rule 412 hearing that S.S. could "open the door up real quick" for evidence it had ruled inadmissible, the State did not call S.S. as a witness during its case-in-chief. The Defendant subpoenaed S.S., and prior to her testimony, the trial court held a jury-out hearing to let the Defendant "make a tender." During the jury-out hearing, S.S. testified that she had been "sexually abused as a child" from the ages of three until nine. S.S. denied that she alleged in a petition for an order of protection against her husband that her husband "was showing pornography to the children." When confronted with the actual petition, S.S. admitted that she had written that her husband was "[s]ending dirty sayings and exposing [her] and the kids to pornography." S.S. characterized her false statement as "an overreaction," stated that she filed the petition because she was "mad" at her husband, and explained that she and her husband "were on the verge of a separation" when she filed the petition. S.S. also admitted that she had been banned from the local Walmart for "stealing" food. S.S. further admitted that she was not allowed at J.S.'s school without an escort because of "an altercation with [J.S.'s] teacher."

S.S. testified that she taught J.S. "to report any inappropriate touching" and "to report it immediately . . . . No matter who it is." S.S. then testified that when J.S. arrived home on February 12, 2008, she asked her if her father and brother were asleep and then told S.S., "The Defendant touched me on my privates." S.S. testified that she asked J.S. to "explain" what happened to her. When J.S. finished explaining what happened, S.S. called T.D.F. and "told her she was to get her butt up to [their] apartment." According to S.S., after she spoke to T.D.F., she "called the cops" and woke her husband up. S.S. denied that there were people in her apartment other than members of her family. S.S. also denied that she had "exaggerated or misconstrued" what she had been told by J.S., testifying that J.S. "told [her] that she was touched in her breast and her vagina area and [] on her buttocks."

Following the proffer of S.S.'s testimony, the trial court ruled that S.S. could be called to testify about when J.S. arrived home, what J.S. told her, and to impeach Chief Tilson's testimony about how many people were in the apartment that night. However, the trial court ruled that any possible testimony impeaching S.S.'s credibility would not be allowed because "you can't put her on . . . only for the purpose of impeaching her."

Again, we review the trial court's decisions regarding the admissibility of evidence for an abuse of discretion. Gray, 960 S.W.2d at 606. Tennessee Rule of Evidence 607, entitled "Who May Impeach?," states that the "credibility of a witness may be attacked by any party, including the party calling a witness." The Advisory Commission Comments to Rule 607 provide a caveat to this broad rule stating that "[d]ecisional law prohibits a lawyer from calling a witness-knowing the testimony will be adverse to the lawyer's position-solely to impeach that witness by an inconsistent statement." Additionally, this court has previously stated that Rule 607 "permits impeachment by either party so long as the questioning is not a pretext for putting inadmissible hearsay before the jury." State v. Jones, 15 S.W.3d 880, 891 (Tenn. Crim. App. 1999). Furthermore, impeachment "cannot be a 'mere ruse' to present to the jury prejudicial or improper testimony." Id. at 892.

We conclude that the trial court abused its discretion by not allowing the Defendant to question S.S. about whether she had previously lied "in court" or lied in the petition for an order of protection. As the trial court pointed out during its ruling, there were legitimate reasons for the Defendant to call S.S. as a witness beyond impeachment. The fact that the alleged incident occurred in the early morning hours and that J.S. did not return home and tell her mother about the allegations until that evening was important to the Defendant's theory of the case. S.S.'s testimony established that J.S. did not return home and talk to her until that evening after her father and brother were in bed. S.S. further testified that her first response was not to call the police but to get T.D.F. to come to her apartment. S.S. also contradicted Chief Tilson's testimony that the apartment was crowded with people and loud. In fact, S.S. testified that J.S. was standing next to her as she told the police about the allegations for the first time. This directly contradicted Chief Tilson's testimony that J.S. was across a crowded and loud room while he interviewed S.S. Therefore, the Defendant did not call S.S. solely for the purpose of impeachment.

Likewise, the Defendant did not attempt to present inadmissible hearsay or otherwise prejudicial or improper testimony in his attempt to impeach S.S. While the State and the trial court asserted that a witness may never be called solely for impeachment purposes, that is not what is stated in the Advisory Commission Comments to Rule 607. An adverse witness may not be called solely for impeachment by an inconsistent statement. Tenn. R. Evid. 607, Advisory Comm'n Cmts. In general, a witness "may not be impeached primarily for the purpose of introducing [a] prior inconsistent statement" for fear that "the jury will misuse the

statement by considering it as substantive evidence." NEIL P. COHEN, SARAH Y. SHEPPEARD, & DONALD F. PAINE, TENNESSEE LAW OF EVIDENCE § 6.13[2][d] (6th ed. 2011). Here, the Defendant sought to impeach S.S. based upon a specific instance of her conduct to attack her character for truthfulness. At the jury-out hearing, the Defendant established a good faith basis for questioning S.S. about the statement in her petition for an order of protection. S.S. initially denied making the allegation, but when confronted with the petition, she admitted that the allegation was false. Therefore, we believe the trial court abused its discretion by not allowing the Defendant to question S.S. about these false allegations. However, we note that if "the witness denies the conduct, the party proffering the evidence must be satisfied with that response and may not seek to prove the conduct by extrinsic evidence," such as the petition. Wyrick, 62 S.W.3d at 780.

With respect to the other impeachment issues addressed during the jury-out hearing, S.S. having been banned from Walmart and J.S.'s school as well as S.S.'s history of sexual abuse, the Defendant did not raise these issues in his motion for new trial or his brief on appeal. Therefore, the Defendant has waived appellate review of these issues. See Tenn. R. App. P. 3(e); Tenn. R. App. P. 36(a).

*C. Sentencing Hearing*

The Defendant contends that the trial court erred in denying him an alternative sentence because it relied on a psychosexual evaluation which was based on "unreliable scientific tests." The Defendant argues that the trial court's decision was primarily based upon an evaluation prepared by Counseling and Consultation Services, Inc. (CCS). The Defendant complains that the conclusions of the CCS report were based upon a Penile Plethysmograph (PPG) assessment as well as a Sexual Scenario Rating Scale (SSRS), a test created by CCS's president. The Defendant argues that both tests were scientifically unreliable and not admissible under McDaniel v. CSX Transporation, Inc., 955 S.W.2d 257 (Tenn. 1997). Therefore, the Defendant concludes that the trial court erred by basing its decision on the CCS report and that he should be entitled to a new sentencing hearing. The State responds that the trial court was required by statute to consider the CCS report. The State further responds that the trial court also relied on a second psychosexual evaluation prepared by Sex Offender Solutions (SOS) which came to the same conclusion about the Defendant's risk to re-offend.

Prior to sentencing and pursuant to Tennessee Code Annotated section 39-13-705, the Defendant reported to CCS for a psychosexual evaluation. As part of the CCS evaluation, the Defendant was subjected to a PPG assessment, which the CCS report described as "designed to measure sexual responsiveness to a variety of stimulus objects across gender, age, and sexual activity." A monitoring device was placed on the Defendant's penis to

monitor "his penile response" to several audio and visual stimuli. Devices were also attached to the Defendant to monitor his "Galvanic Skin Response (GSR) and respiration . . . to assist in detecting faking." The CCS report stated that "[d]eviant sexual arousal is one of the best indicators of risk to re-offend." The CCS report concluded that the Defendant "demonstrated clinically significant arousal to four" specific stimuli and considered his arousal "to be deviant." The CCS report also stated that the Defendant was given a SSRS test and that the Defendant answered "neither" to several questions. The CCS report concluded, without stating why, that the Defendant's responses were "typical of individuals who are trying to be misleading or 'look good' regarding their sexual arousal." The CCS report diagnosed the Defendant as presenting "with multiple sexual paraphilias – voyeurism and child molestation." The CCS report concluded that the Defendant was a moderate risk to re-offend and that "community based treatment [was] not appropriate" due to the Defendant's "unwillingness to acknowledge his offense behavior."

Following the submission of the CCS report, the Defendant filed an objection to its admissibility and requested a second psychosexual evaluation. The trial court granted the Defendant's request for a second psychosexual evaluation which was performed by SOS. The SOS report criticized the CCS report's conclusion that the Defendant was not an appropriate candidate for "outpatient or community based treatment." The SOS report challenged the CCS report's diagnosis that the Defendant exhibited "voyeuristic behaviors," stating that the only evidence for the diagnosis was from the SSRS test. The SOS report stated that the SSRS test was not approved by the American Psychological Association and that it had not "been subjected to peer review, there [was] no known potential error rate, it [was] not generally accepted by the community and it [did] not appear to be supported by empirical testing." The SOS report concluded that the SSRS test appeared to be "fundamentally flawed." The SOS report also concluded that there was "no justification" for the CCS report's statement that the Defendant's answers on the SSRS test were an attempt "to make himself 'look good'" other than "the writer's unsubstantiated opinion." The SOS report concluded that the Defendant was a moderate risk to re-offend. However, the SOS report concluded that the Defendant was amenable to treatment and that the Defendant "should attend a moderate-risk outpatient sex offender treatment program." The SOS report further stated that there was "no clinical reason that [the Defendant] should not participate in outpatient treatment based on his needs or assessment results."

At the sentencing hearing, the Defendant presented the testimony of Charles Albert Bellefant, Jr. Mr. Bellefant was the vice-president of SOS, a licensed marital and family therapist, and was approved by the Tennessee Sex Offender Treatment Board as a sexual offender treatment provider and evaluator. Mr. Bellefant testified that he had been approved as a sexual offender treatment provider for 9 years and had conducted between 200 and 300

psychosexual evaluations. The trial court allowed Mr. Bellefant to testify as an expert on psychosexual evaluations.

Mr. Bellefant testified that the SSRS test used in the CCS report was not used or approved by "any recognized board . . . or any other test-governing body." Mr. Bellefant further testified that it was his understanding that the SSRS test was created by CCS's president and that it was "something that he either worked on when he was in his master's degree or when he was working on his doctorate." Mr. Bellefant also testified that, to his knowledge, the SSRS test had not "been subject to peer review."

With regard to the PPG, Mr. Bellefant testified that it was "disputable as an evaluation tool for [] multiple reasons." Mr. Bellefant explained that it was "questionable as to whether or not [a PPG was] reliable" because there was "no normative data" to compare a supposedly deviant sexual result too. Mr. Bellefant also testified that there had been "no research [] done into what the results [of a PPG] mean." Mr. Bellefant testified that he had received training on how to administer a PPG but he did not use the device as an evaluation tool because there were "unclear issues as to how the results can be used." Mr. Bellefant also stated that he had been taught during his training on the PPG that "the test was never designed to be used as an evaluation tool, but as a treatment tool." According to Mr. Bellefant, the CCS report recorded that the Defendant had "clinically significant arousal" but it did not specify "if those responses were blood flow responses, galvanic skin responses, or . . . breathing responses." Mr. Bellefant also testified that he thought it was wrong for the CCS report to place so much emphasis on the Defendant's denial of the charges against him because he felt denial of guilt had "a very low correlation to recidivism."

Mr. Bellefant testified that following his evaluation of the Defendant, there was "insignificant diagnostic criteria for [the Defendant] to fit under any specific sexual-related diagnostic" such as paraphilia or pedophilia. Therefore, Mr. Bellefant classified the Defendant as presenting with a sexual disorder not otherwise specified. Mr. Bellefant classified the Defendant as a moderate risk to re-offend but concluded that there was "no clinical reason to state that [the Defendant] couldn't approach his treatment on an outpatient basis." Mr. Bellefant also testified that he felt the rules imposed in an alternative sentence would likely constrain the Defendant from re-offending.

Following Mr. Bellefant's testimony, the trial court ruled that the CCS report was admissible at the sentencing hearing. After the trial court's ruling, the Defendant presented the testimony of Deborah Black Lonon. Ms. Lonon testified that she was a local attorney who had known the Defendant for several years. Ms. Lonon testified that she believed that the Defendant was honest and that he would comply with the rules of an alternative sentence. The Defendant testified about his work history, living situation, and medical conditions. The

Defendant insisted that he would comply with all of the rules of an alternative sentence. The Defendant again denied that he committed the offense and stated that he felt he was accused because people in his apartment complex "wanted [him] out of there" because his youngest daughter was African-American. Following the Defendant's testimony, the State called Chief Tilson who testified that over the previous two years, "sexual offenses" had increased in Unicoi County.

The trial court denied alternative sentencing stating that the CCS report "about as clearly as you can get . . . indicates in rather strong language . . . that [the Defendant] probably would" re-offend. The trial court also stated that the SOS report "indicates basically the same conclusion, the Defendant has a moderate probability of re-offending. But they believe he could be handled in [an] out-of-prison type situation." In reaching its conclusions, the trial court stated that sentencing would "boil it down to the easiest issue" which was "when this judge goes home tonight and lays his head down on the pillow, am I going to be confident that the Defendant might not harm another child?" The trial court concluded that "relying on the [CCS] report, [he] could not lay [his] head on the pillow and say that [the Defendant] wouldn't re-offend if [he] placed him out in the community, even if he did receive treatment and counseling."

Tennessee Code Annotated section 39-13-705(b) provides that a convicted sex offender seeking an alternative sentence "shall be required to submit to" a psychosexual evaluation and that evaluation "shall be included as part of the presentence report and shall be considered by the [trial] court in determining" whether to grant an alternative sentence. However, the "rules of evidence shall apply" to a sentencing hearing "except that reliable hearsay . . . may be admitted if the opposing party is accorded a fair opportunity to rebut any hearsay evidence so admitted." Tenn. Code Ann. § 40-35-209(b). Our supreme court has previously held that trial courts when imposing sentences "should not consider polygraph examination results or any portion of a" psychosexual evaluation "that relies upon polygraph examination results" because polygraph evidence is "inherently unreliable, and therefore irrelevant and inadmissible." State v. Pierce, 138 S.W.3d 820, 826 (Tenn. 2004). Therefore, a trial court is not required to consider a psychosexual evaluation that is based upon otherwise inadmissible evidence.

In Tennessee, trial courts act "as gatekeepers when it comes to the admissibility of expert testimony" regarding scientific evidence. State v. Scott, 275 S.W.3d 395, 401 (Tenn. 2009). The trial court "must assure itself that the [expert's] opinions are based on relevant scientific methods, processes, and data, and not upon an expert's mere speculation." McDaniel, 955 S.W.2d at 265. In determining the reliability of scientific evidence, trial courts should consider the following non-exhaustive list of factors: (1) whether scientific evidence has been tested and the methodology with which it has been tested; (2) whether the

evidence has been subjected to peer review or publication; (3) whether a potential rate of error is known; (4) whether the evidence is generally accepted in the scientific community; and (5) whether the expert's research in the field has been conducted independent of litigation. Id. The party proffering expert testimony regarding scientific evidence bears the burden of establishing that the evidence "rests upon 'good grounds.'" Scott, 275 S.W.3d at 404.

Despite the Defendant's challenge, the State presented no evidence on the scientific reliability of the PPG and SSRS tests. The Defendant, however, presented Mr. Bellefant's testimony questioning the reliability of both tests. With regard to the PPG, Mr. Bellefant testified that there was no normative data to compare alleged deviant responses to and that the test "was never designed to be used as an evaluation tool." As for the SSRS test, Mr. Bellefant testified that it was not used or approved by "any recognized board . . . or any other test-governing body" and that it had never been subjected to peer review. In addition to Mr. Bellefant's testimony, several other jurisdictions have held that the PPG test fails to meet the scientific validity requirement for admissibility. See Doe ex rel. Rudy-Glanzer v. Glanzer, 232 F.3d 1258, 1266 (9th Cir. 2000) (stating that "courts are uniform in their assertion that the results of [PPGs] are inadmissible as evidence because there are no accepted standards for this test in the scientific community"); United States v. Powers, 59 F.3d 1460, 1471 (4th Cir. 1995); State v. Spencer, 459 S.E.2d 812, 814-16 (N.C. Ct. App. 1995); Billips v. Commonwealth, 652 S.E.2d 99, 102 (Va. 2007).

The CCS report relied on both the PPG and SSRS tests in coming to its ultimate conclusion that "community based treatment [was] not appropriate" for the Defendant. As stated in its discussion of the PPG test, the CCS report viewed "[d]eviant sexual arousal [as judged by the PPG test as] one of the best indicators of risk to re-offend." Likewise, the CCS report emphasized the Defendant's "unwillingness to acknowledge his offense behavior" as evidenced by his attempt to "look good" on the SSRS. However, as the SOS report stated, there was "no justification" for this statement in the CCS report other than "the writer's unsubstantiated opinion." Accordingly, we conclude that the trial court abused its discretion when it admitted the CCS report into evidence at the sentencing hearing.[8]

---

[8]We will not address the Defendant's last remaining issue raised in his brief, that the trial court erred in denying him alternative sentencing. Because the CCS report was the key factor in the trial court's decision, we would typically remand the case for a new sentencing hearing. However, because we have concluded that the judgment should be reversed and dismissed due to the insufficiency of the evidence, we are only addressing this issue so as not to pretermit it.

## CONCLUSION

In consideration of the foregoing and the record as a whole, we reverse and dismiss the Defendant's conviction for attempted aggravated sexual abuse.

_____
D. KELLY THOMAS, JR., JUDGE